William W. **WINPISINGER** et al., Plaintiffs,

v.

**AURORA CORPORATION** et al., Defendants.

No. C75–589.

United States District Court, N. D. Ohio, E. D.

Feb. 1, 1979.

Roger B. Hunt, Donald J. Wood, Hausser-
mann, Davison & Shattuck, Boston, Mass.,

Bourne P. Dempsey, Hasse, Dempsey & O'Loughlin, Cleveland, Ohio, for Gaudio, Gallucci, Klipp, Kirsch, Terbrack and Lewicki.

Jerome S. Cohen, Plan Benefits Sec. Div., Washington, D. C., for Usery.

John A. Hallbauer, Cleveland, Ohio, for Butler, Pieklik, and for Gaudio, Gallucci, Klipp, Kirsch, Terbrack and Lewicki.

Ebert Weidner, Cleveland, Ohio, for Winpisinger and for Butler, Pieklik, and for Gaudio, Gallucci, Klipp, Kirsch, Terbrack and Lewicki.

Mortimer Riemer, Riemer & Oberdank, Cleveland, Ohio, for Thompson, Bell, Rygus and Gettel.

Michael E. Fox, Scott A. Lathrop, Adams, Fox, Marcus & Adelstein, Chicago, Ill., Robert A. Goodman, Peter R. Harwood, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Winpisinger.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

Plaintiff trustees of the I.A.M. National Pension Fund sought a declaration of lawfulness with reference to an amendment (new subsection (k) of Article II, section 8) to the National Pension Plan, adopted June 12–13, 1975, effective June 30, 1974. The amendment cancelled the past service credits in the Pension Plan of the individual defendants and other class members[1] of Precision Castings Division of defendant Aurora Corporation. Plaintiffs asked that the validation of the cancelled past service credits be binding upon all class members and Aurora Corporation.

Aurora Corporation of Illinois, Precision Castings Division, and its predecessor, Precision Castings, had a collective bargaining agreement with the IAM covering less than 30 employees at the Cleveland plant. This agreement was in effect from 1965 until Aurora closed its Precision Casting Plant in Cleveland, Ohio on or about July 12, 1974.

The employees at Precision (Cleveland and Fayetteville, New York) who make up the sub-classes (see n. 1) fall within the category "Special Classes" provided for in the Pension Plan. "Special Classes" embrace non-IAM employees of an employer who had a collective bargaining contract with the International Association of Machinists.

Asserting a violation of ERISA Title I, § 404(a)(1) (Fiduciary Duties) 29 U.S.C. § 1104(a)(1), the Secretary of Labor moved to intervene as a necessary party in the litigation. Plaintiffs objected, claiming that ERISA did not apply. Plaintiffs argued that the Trustees' resolution of June 12, 1975 related back to the closing of the plant before ERISA became law on September 2, 1974. The objection was overruled in a written memorandum and order filed March 21, 1976.

On February 21, 1978 this court entered its memorandum and order. This court declared invalid the section 8(k) amendment to Article II of the Pension Plan of the IAM National Pension Fund. Section 8(k), added retroactively on June 12–13, 1975, operated to abrogate the pension plan's past service credits of the former employees of Precision Castings Division who make up the defendant sub-classes. The past service credit of former employees of Precision Castings who participated in the Pension Plan as IAM members were not affected by the amendment of June 12, 1975. It was determined that by retrospectively divesting the past service credits of the subclasses, the plaintiff trustees failed to discharge their fiduciary duties with respect to the Plan "in accordance with the documents and instruments governing the Plan" and as required by section 404(a)(1) of Title I.

---

1. This court certified two defendant subclasses.

(1) Former employees of Precision in Cleveland, Ohio who were represented by, and were members of, the Federal Labor Union, No. 243 87, AFL–CIO, and who, in November of 1973, became represented by the Metal Polishers and Helpers Union, AFL–CIO, Local 500 (the "union subclass"); and

(2) Present and former employees of Precision in Cleveland and Fayetteville, New York who were not represented by a Union (the "non-union subclass").

In the memorandum and order of February 21, 1978, it was provided that, "subsequent orders . . . fixing reasonable attorneys fees for attorneys for the Special Classes will be entered either pursuant to agreement or taking of evidence if necessary." The parties being unable to agree, counsel for each sub-class has filed an application for fees.[2] Union sub-class counsel moves for an award of fees in the amount of $57,600. Counsel arrives at this figure by multiplying the total of 460½ hours expended by three attorneys in the firm by $125 an hour. One hundred and twenty five dollars is approximately twice the hourly rate of the three attorneys (averaged) for the periods of time covered by the services rendered.

Counsel for the non-union employee subclass seek $77,225 for services rendered to September 15, 1978. This sum represents the product of 608 total hours (three attorneys) times $125 an hour. As with the union sub-class attorneys, the non-union sub-class attorneys apparently have averaged the average hourly rate of the three attorneys for the time period in question.

Plaintiffs agree that applicants are "entitled under ERISA, 29 U.S.C. § 1132(g), to an award of reasonable attorneys' fees for the representation of the Special Classes." In opposing the requested hourly rate of $125, plaintiffs state that this rate is "excessive and inconsistent with appropriate judicial guidelines."

## I.

■ Title I of ERISA, section 502 entitled "Civil Enforcement," 29 U.S.C. § 1132, provides in section 1132(g):

In any action under this Title by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

In the absence of any reference to this language in the ERISA legislative history, Congress will be understood to have intended that the words be given their usual and ordinary meaning. Since "a reasonable attorneys' fee" may be allowed "to either party," it is concluded that fees may be allowed to counsel for either the prevailing party or the unsuccessful party. In this respect, this section markedly differs from those attorney fee statutes that restrict a court's allowance of attorney fees to counsel for the prevailing party.[3]

■ In seeking a favorable declaration that their retroactive cancellation of the prior service credit was valid as applied to the special classes, it was essential for the plaintiffs to join the special classes and obtain class certification under Rule 23(b)(2). Otherwise, this court's adjudication, if favorable to the plaintiff trustees, could not have been binding upon all members of the special classes. An essential element in obtaining a binding adjudication was that the special classes be adequately represented by competent counsel. Hence, even though the special classes had not prevailed, nonetheless section 1132(g) would have permitted this court to allow a reasonable attorney's fee to counsel for the special classes. Section 1132(g)'s term "either party" is broad enough to have embraced the "special classes" under those circumstances.

■ In fixing a reasonable attorney's fee under section 1132(g), the traditional formula of hours of services times reasonable hourly rate provides a court with a traditional starting point. However, the language of the section does not require that such starting point should finally fix the fee without reference to whether the party pre-

---

2. The final submissions of counsel were in January, 1979 in the form of letters responding to the court's questions as to standard billing rates. Plaintiff trustees' counsel submitted their figures but entered a timely objection.

3. Thus, 42 U.S.C. § 1988, as amended Public Law 94-559, section 2, October 19, 1976, 90 Stat. 2641 provides:

In any action or proceeding to enforce a provision of section 1981, 1982, 1983, 1985, and 1986 of this Title . . . or Title 6 of the Civil Rights Act of 1964, the court, in its discretion, *may allow the prevailing party,* other than the United States, *a reasonable attorney's fee* as part of the cost. [Emphasis added.]

vails or fails. Otherwise the incentive of a higher fee, if counsel succeeds in winning the case for his client, would not be present.

What then are the pertinent factors to be applied in deciding what, if any, adjustment—upward or downward—should be made in the starting formula of hours of services times reasonable hourly rate in compensating counsel for a party in an ERISA action? One turns for possible assistance to *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973) (*Lindy I*), and *Lindy II*, 540 F.2d 102 (3rd Cir. 1976); and *City of Detroit, et al. v. Grinnell Corp., et al.*, 495 F.2d 448 (2nd Cir. 1974) (*Grinnell I*), and *Grinnell II*, 560 F.2d 1093 (2nd Cir. 1977).

Both *Lindy* and *Grinnell* involve charging fees against settlement funds in anti-trust cases. In each case the equitable fund doctrine was applied to permit attorneys whose actions conferred a benefit upon a given group or class of litigants to file claims against the settlement fund for reasonable compensation for the services and efforts of the attorneys.

While using different nomenclature, both *Lindy* and *Grinnell* apply the same factors. In each the starting point was multiplication of the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area. Once this base or "lodestar" rate was established, *Lindy* considered as additional factors the contingent nature of success and the quality of the attorney's work. *Lindy II*, 540 F.2d at 112, noted that:

> In *Merola II* [*Merola v. Atlantic Richfield Co.*, 515 F.2d 165] we observed that the second factor is "evidenced by the work observed, the complexity of the issues and the recovery obtained. In settled cases, the second additional factor [quality] is reflected largely in the benefit produced. . . ." 515 F.2d at 168–69.

*Grinnell* says that once the base or "lodestar rate" is established, other less objective factors such as "the attorney's risk of litigation," may be introduced into the calculus.

## II.

■ Concerning the first factor of "contingent nature of success," Chief Judge Seitz in *Lindy I* stated:

> In assessing the extent to which the attorneys' compensation should be increased to reflect the unlikelihood of success, the district court should consider any information that may help to establish the probability of success.

487 F.2d 161, 168. In *Grinnell I*—on the same subject—Judge Moore wrote:

> Perhaps the foremost of [the less objective] factors is the attorney's "risk of litigation," i. e., the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee.

Necessarily the rationale of any factor of "contingent nature of success" ("risk of litigation") is that if there was neither victory nor settlement, no fees would be forthcoming to compensate counsel for services rendered. Counsel for the sub-classes contend "that [r]ecovery of compensation was very much contingent upon the ultimate outcome of the case." Such an argument is misplaced. Section 1132(g), as this court construes it, eliminates the contingency of no fees being awarded, even though counsel's client was unsuccessful, where the services rendered were beneficial or necessary to the administration of the pension fund. Since the "contingency of success" factor is not here relevant, the basic hourly rate of counsel for the special classes will not be increased to account for such factor.

■ Counsel also invoke the equitable fund doctrine to justify the "doubling" of their hourly rate. Thus, counsel for the non-union sub-class states (and counsel for the union sub-class repeats):

> The total award requested by counsel for both special classes in this action barely equals five percent of the two and one-half million dollar value of the recovery by the special class members.

The equitable fund doctrine, recognized in *Trustees v. Greenough*, 105 U.S. 527, 532 (1881), is reaffirmed in *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975) as:

. . . the historic power of equity to permit the trustee of a fund or property, or a party preserving or recovering a fund for the benefit of others in addition to himself, to recover his costs, including his attorneys' fees, from the fund or property itself or directly from the other parties enjoying the benefit.

It is not accurate to treat the $2.6 million value of the pension rights of the special classes as an equitable fund which counsel for the sub-classes have recovered. The size of the total value of the pension rights of the special classes was not effected by the efforts of counsel.[4] But even assuming counsel's analogy applied, counsel is not seeking to charge their 100 percent add-on against the $2.6 million value as an equitable fund. Instead, they seek to charge their fees against the entire Pension Fund. Hence, any attempt to employ the equitable fund doctrine is inappropriate.

### III.

■ The "quality of the attorney's work" is the other factor to consider in ascertaining whether the hourly rate should be increased in awarding fees to counsel for the sub-classes. Chief Judge Seitz in *Lindy I* amplifies "the quality of an attorney's work [which] mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled."[5]

Initially it is observed that two sets of attorneys represent the class action defendants because this court, on motion of the plaintiff trustees, established two sub-classes. Before certification of the two sub-classes, the non-IAM union defendants were represented by one set of lawyers who thereafter represented the union sub-class. The non-IAM non-union defendants employed at Cleveland and Fayetteville were represented by different lawyers and they have continued to represent the non-union sub-class. This court has recognized the necessity of different lawyers for each sub-class to avoid any possible conflict of interest.[6]

Counting the number of entries in the docket sheets of this case gives a quick scan of the dimensions of the case. It was filed on July 9, 1975. There were 23 entries in 1975. In 1976 there were 30 entries. Fifty entries were recorded in 1977. The 16 entries in 1978 bring the total through 1978 to 119.

---

4. As the fund's counsel correctly observes:
   In the instant case, the "amount of recovery" was set from the beginning by the number of beneficiaries, multiplied by each individual.

5. In evaluating the quality of an attorney's work in a case, the district court should consider the complexity and novelty of the issues presented, the quality of the work that the judge has been able to observe, and the amount of the recovery obtained. This last factor may be the only means by which the quality of an attorney's performance can be judged where a suit is settled before any significant in-court proceedings. In making allowance for the quality of work, the court must keep in mind that the attorney will receive an otherwise reasonable compensation for his time under the figure arrived at from the hourly rate. Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good.

6. Despite their motion on April 20, 1976 for maintenance of class action and establishment of two sub-classes, plaintiffs now argue that they:

   . . . were compelled to create two sub-classes, union and non-union, because of Aurora's desire to continue to make contributions on behalf of non-union employees in both Cleveland and Fayetteville, who remained on Aurora's payroll.

   However, plaintiff trustees did not claim compulsion at the time they moved for certification of the two sub-classes. Plaintiffs will not be heard now to challenge the two sub-classes set up pursuant to the motion of plaintiff trustees.
   Neither the Secretary of Labor, interested primarily in a national ERISA policy, nor Aurora, concerned with its corporate interests, could properly represent the sub-classes. Moreover, because the non-union sub-class had some interests not shared by the union sub-class, different counsel for each sub-class was necessary.

Study of the principal proceedings, identifiable from docket entries, discloses the work done by various attorneys in developing the record and readying the case for final decision. Counsel for defendants Bednarik, Massengill, and Shroyer of non-IAM union members, filed interrogatories which were promptly answered on December 4, 1976 by the plaintiff-trustees. Answers to these 65 pertinent questions provided names, dates, financial data, actuarial data, and other information obviously helpful both in directing later discovery and in providing some basic facts.

The Secretary of Labor moved to intervene on January 28, 1976. A report of counsel, and opposition of plaintiff trustees to the Secretary's intervention motion were filed on February 9, 1976. On July 31, 1976 by memorandum and order, this court granted the Secretary's motion to intervene.

Plaintiffs' motion to maintain a class action was filed on April 20, 1976. Eight days later an order determining that the case should proceed as a class action was entered. Reports of the number of class members in each sub-class were filed by the union sub-class on June 7, 1976 and by the non-union sub-class on April 19, 1976. These reports reflected the work done by counsel in contacting possible class members and in ascertaining what persons would comprise each class.

The Secretary of Labor on July 12, 1976 filed his notice to depose the fund administrator Higgins. Mr. Frank Higgins was examined for two full days (July 28 and 29, 1976) in Cleveland by Jerome S. Cohen, Office of the Solicitor, Department of Labor. The two attorneys representing each sub-class (four attorneys in all), separately reserved the opportunity to further question the fund administrator at a resumed deposition as also did counsel for Aurora Corporation. The deposition was apparently not later resumed.

The Secretary requested on September 3, 1976 and obtained production of documents from the plaintiff trustees. Pursuant to notice of November 26, 1976, the Secretary on December 15 and 16, 1976 took the depositions of Shepard A. Sheinkman and Mr. Jack Elkin in Washington, D.C. The December 15 questioning of Mr. Sheinkman, Senior Vice President of Martin E. Segal Company, a consulting and actuarial firm (servicing principally multi-employer benefit systems), covering 145 pages of transcript, was conducted about one-half by Mr. Cohen, Office of the Solicitor, and the other half conducted by Mr. Weidner, counsel for the non-union sub-class, Mr. Shaw, counsel for the union sub-class, and Mr. Fox, counsel for Aurora Corporation. Mr. Elkin, actuary with the Segal Company, was questioned on December 16. Covering 81 pages of transcript, Mr. Elkin's questioning was shared about equally by each of the above-named counsel.

Noticing on March 25, 1977, the Secretary of Labor took the depositions of fund trustees Thompson and Winpisinger on April 18, 1977. The deposition of William Winpisinger, also president of the International Association of Machinists, is extended over 164 pages of transcript. Mr. Cohen's questioning occupies 77 pages and the remaining 87 pages (except two pages by Mr. Hunt for the trustees) are apportioned substantially equally between Mr. Shaw (counsel for the union sub-class), Mr. Weidner (counsel for the non-union sub-class), and Mr. Fox (for Aurora Corporation). The deposition transcript of the deposition of Mr. Thompson covering 84 pages, include 54 pages of questioning by Mr. Cohen and 31 pages by Messrs. Shaw, Weidner and Fox.

Defendants Butler, et al. (the non-union sub-class) filed 55 requests for admissions by the plaintiffs on March 7, 1977. The plaintiff trustees on April 15, 1977 responded. As seen, the discovery in the case was undertaken upon the initiative and by the Office of the Solicitor of Labor and counsel for each sub-class.[7] Pre-decision prepara-

---

7. Counsel for the non-union sub-class comments:

Counsel for the union subclasses prepared an extensive first set of interrogatories. The

tion ended at the pretrial hearings of July 27 and August 15, 1977. A pooling of the exhibits was ordered. These exhibits, depositions, responses of the plaintiff-trustees to the requests for admissions, and the 29-item stipulation of facts became the record of undisputed facts upon which the case was submitted for decision. It was concluded that live testimony of trustees was not needed in view of the court's reservation of ruling on Aurora's charge of trustee's bad faith in adopting section 8(k). This charge has been mooted by the court's finding that section 8(k) violates section 404(a)(1)(D) of Title I of ERISA.

Towards the end of the day-long dialogue of August 15, this court articulated the "core questions" that were to be briefed by counsel.[8] In answering these questions in the memorandum and order, this court first forged the test of judicial review:

> [T]he more specific standards of ERISA, rather than the pre-existing rational nexus test, are deemed to now prescribe the standards for fiduciaries of a pension fund which is subject to 1104(a)(1) of ERISA as the Fund here is determined to be. Hence, judicial review of a pension fiduciary's conduct requires a court to determine whether the ERISA standard

of fiduciary responsibility [29 U.S.C. § 1104(a)(1)(D)] has been satisfied.

Applying this test, this court arrived at the determination adverse to the plaintiff trustees, earlier specified. Counsel for the non-union sub-class states:

> The court's memorandum deciding the case shows as much, if not more, acceptance of the arguments of counsel for sub-classes as of those of the Secretary and of Aurora.

The court reached conclusions that coincide with the common views of all defense counsel as to the invalidity of the retroactivity of section 8(k). On this central controlling issue, the arguments of each counsel including those of counsel for the plaintiffs were studied. However, to link a particular analysis or conclusion in the court's memorandum to an argument or idea expressed in a particular brief would be difficult for this court to do. It is more likely that the court reached the conclusions expressed in its memorandum either by its own independent thought processes or by those thought processes partly influenced by arguments of each counsel.

Because of the initiative and responsibility, conscientiously exhibited in representing each sub-class, respective counsel is entitled to its standard billing rate for each counsel

---

initial work on stipulations was done by the Secretary's counsel, Mr. Cohen. When only a few stipulations were agreed upon by the trustees after a day-long meeting of counsel, at the end of which the attorney for the trustees returned to Boston leaving no further progress in sight, counsel for the non-union subclass prepared a comprehensive set of requests for admissions. This ended the impasse and made it possible to submit the case to the court without a trial.

The time record of this sub-class counsel reveals many entries in which the subject of stipulations accounted for time spent after the all-day meeting on February 15, 1977 "to stipulate facts." These entries were on February 6, 17, 22, 23 and 24; March 1, 8, 12, 14; April 7; July 27; August 17, 18; and September 7. Accepting the premise that these hours were all essential, the court recognizes the continuing part played by sub-class counsel in eventually reaching a stipulation of 29 items. The record of August 15, however, reveals that it was at the court's urging that all counsel, including Mr. Cohen, agreed to sign the stipulation "that Mr. Dempsey [Cleveland counsel for the plain-

tiffs] circulated on July 27." On September 19, 1977, the signed document was filed with the court.

The court has trouble with the assertion that it was the plaintiffs' responses to the requests for admission that "ended the impasse and made it possible to submit the case to the court without a trial." Examination of those responses (23 admissions, 17 qualified, 7 "do not answer" because of lack of knowledge or understanding, 6 denied, and 6 denied with qualifications), taken together with the record of July 27 and August 15, 1977 do not support such a causal connection. Rather, it was the give and take of the hearing of August 15 that finally produced the submission of the case without a formal taking of evidence.

8. In September and October, 1977, each of the parties simultaneously filed an original and a reply brief. The Secretary labeled its first brief as a motion for summary judgment. Rather, it is more accurate to identify the submission of the case to this court as a trial on the merits, based only on undisputed facts of record.

for the hours logged for such counsel with the revisions noted in the margin.[9]

*Lindy I, supra* directs that in determining whether the quality of an attorney's work mandates increasing the reasonable hourly rate, the trial court should consider the "complexity and novelty of the issues presented." The complexity and novelty of the present case is self-evident. It is demonstrated in the three memoranda filed previously by this court and by this fourth memorandum opinion. Plaintiffs concede the "complexity of this case," and that ERISA "was new law at the time the suit was begun." From this concession, plaintiffs argue:

Applicants should not now be allowed to rely upon the novelty and complexity of the issues to increase their awards, and ignore the assistance, at no cost to their clients, of the Department of Labor, as well as Aurora Corporation.

Due weight has been given to the full participation of the Secretary of Labor in helping the sub-classes grapple the complexities of this case and to the active joinder of the Secretary and Aurora Corporation with the sub-class in attacking the validity of section 8(k), the central novel question in the case. It is concluded that an increase of ten percent represents an appropriate additur to compensate sub-class counsel for the quality of their services in this complex and novel case.

### IV.

■ Using the approved billing rates of each counsel, the "lodestar" compensation for the attorneys for each sub-class is fixed as here calculated. The ten percent increase has been added to each sub-total.

Non-union sub-class:

Ebert Weidner:

| | |
|---|---|
| 18.2 hours at $40.00 an hour | $   728.00 |
| 160.6 hours at $50.00 an hour | 8,030.00 |
| 68.7 hours at $65.00 an hour | 4,465.50 |
| Total | $13,223.50 |

9. While Mr. Oberdank totals his time as 115 hours, the correct total is 104 hours.

Eight hours were logged in April, 1978 by one of counsel for the union sub-class concerning the subject of attorney fees. *Prandini v. National Tea Co.*, 585 F.2d 47 (3rd Cir., 1978) offers authority for awarding fees under statutory fee authorizations because counsel may "become wary about taking Title VII cases, civil rights cases, or other cases for which attorneys' fees are statutorily authorized." It is inapplicable here. The objection here is not to the number of hours logged or the rates charged, but to the 100 percent bonus sought by counsel for the sub-classes. Contesting this premise of sub-class, counsel's applications for fees raises a point of law, novel in its ERISA context. The Fund should not be charged for legal services that confer a benefit, not on the special classes, but on their counsel.

The time of attorney William Shaw, an associate with the firm that has represented the union sub-class, is billed at $60 an hour, the same rate charged for the time of Lawrence Oberdank, Esq., a partner in said firm. Mr. Shaw was apparently not admitted to the bar until 1975. However, he was given the responsibility of acting as counsel for this sub-class, interrogating deposition witnesses, and writing the brief of the Union sub-class, work that otherwise would have been performed by Mr. Oberdank. Considering all these factors and the Ohio rates for lawyers of four to five years experience, this rate will be reduced $10.00 an hour to $50.00.

The billing of the time of two lawyers for each sub-class for attendance at the first day of the Higgins deposition (July 28, 1976) and for two attorneys of the union sub-class at the second day's session, is questioned by plaintiffs' counsel. Since this was the first deposition involving the fund administrator's testimony, and it could not have been known that Mr. Cohen's questioning would occupy all of two days, counsel for the union sub-class (both) could justify their joint presence, (a) in the event they had an opportunity to question the witness; and, (b) since this deposition provided both with an appropriate opportunity to become informed on the intricate workings of the Fund and its policies.

John Hallbauer:

| | | |
|---|---|---|
| 5.6 hours at $40.00 an hour | $ 224.00 | |
| 327.7 hours at $50.00 an hour | 16,385.00 | |
| Total | | 16,609.00 |

Richard Bancroft:

| | | |
|---|---|---|
| 32.8 hours at $40.00 an hour | $ 1,312.00 | |
| | 90.00 | |
| Total | | 1,402.00 |

Robert Dilling:

| | | |
|---|---|---|
| 2 hours at $35.00 an hour | $ 70.00 | |
| Total | | 70.00 |
| Total | | $31,304.50 |
| Plus 10 percent | | 3,130.45 |
| TOTAL | | $34,434.95 |

Union sub-class:

Lawrence Oberdank:

| | | |
|---|---|---|
| 39.45 hours at $60.00 an hour | $ 2,367.00 | |
| 65.58 hours at $70.00 an hour | 4,590.60 | |
| Total | | $ 6,957.60 |

Mortimer Riemer:

| | | |
|---|---|---|
| 146.75 hours at $60.00 an hour | $ 8,805.00 | |
| Total | | 8,805.00 |

William K. Shaw:

| | | |
|---|---|---|
| 171.8 hours at $50.00 an hour | $ 8,590.00 | |
| Total | | 8,590.00 |
| Total | | $24,352.60 |
| Plus 10 percent | | 2,435.26 |
| TOTAL | | $26,787.86 |

Plaintiff trustees are ordered to pay said total amounts to sub-class counsel as reasonable attorney fees fixed under 29 U.S.C. § 1132(g) and expenses as billed.

V.

■ Plaintiffs have requested that this court assess either "all of the fee awarded . . . the non-union sub-class" or "one half the total fees allowed for both sub-classes" against Aurora Corporation:

As we pointed out to the Court at the hearing on Aurora's Application for fees on July 3, 1978, tr. page 12, Plaintiffs were compelled to create two sub-classes, union and non-union, because of Aurora's desire to continue to make contributions on behalf of non-union employees in both Cleveland and Fayetteville, who remained on Aurora's payroll, but not on behalf of the union employees whose employment was terminated (Complaint, paragraphs 8 and 9, admitted by Separate Answer of Aurora). Although Aurora had the right as a matter of business judgment to elect to seek disparate treat-

ment of its union and non-union employees, it should bear at least a portion of the additional expense thrust upon the Fund as a result.

This court reiterates that at the time they sought establishment of two sub-classes, with the inevitable representation of each sub-class by different counsel, no claim was made of "compulsion" to create the two sub-classes.

In justification for its fee-shifting request, plaintiffs quote from this court's oral opinion in denying Aurora's application to charge its attorney fees against the pension fund. In part, this court said:

> . . . and so in a sense the whole issue of unfunded liability was created by Aurora, and that was because of a business judgment that they decided to do this, but it seems to me it would be wholly inequitable, bearing in mind that the source of the whole problem here was Aurora's action, to now permit Aurora, who certainly imposed on the funds an enormous liability, to come back to the fund and ask to be paid attorney's fees—that runs against my grain in terms of equitable consideration." (Transcript of hearing July 3, 1978, pages 32–33)

While equitable considerations prompted this court, in its discretion, to deny Aurora's attempt to recoup its attorney fees, pursuant to 29 U.S.C. § 1132(g), that statement cannot be a springboard from which the plaintiffs attempt to leap to this court affirmatively imposing on Aurora fees of the non-union sub-class, or one-half of both sub-class fees, here awarded.

As Aurora points out, this court on July 13, 1977 denied the request of the plaintiff-trustees to add Count III to the complaint in which count "the Trustees essentially ask that a duty be imposed upon Aurora to pay the unfunded pension liability of the fund." This court held that it "can find no legal basis for imposing the obligation the Trustees seek upon Aurora." Subsumed within that conclusion is a preclusion of the present request to shift to Aurora the ancillary obligation of paying attorney fees of the sub-classes that are being charged against the Fund.

Moreover, even assuming that section 1132(g) were held to be applicable to Aurora Corporation in fashioning the present award of attorney fees against the plaintiff-trustees, this court does not find the present circumstances for charging Aurora. When it exercised a business judgment to close its Cleveland plant in July, 1974, ERISA was not yet in effect. This court affirms its ruling of July 13:

> ERISA was not applicable at the time the plant closed, and it is doubtful that it would apply to this situation now.[4]

> [4] The applicable section of ERISA, 29 U.S.C. § 1363, does impose liabilities upon "substantial employers" when they withdraw from participation in a multiemployer plan; but section 1301(a)(2) defines a "substantial employer" as one who in immediately preceding years had made contributions "equaling or exceeding 10 percent of all employer contributions paid to or under [the] plan . . . ." Aurora apparently did not satisfy this requirement.

Upon the foregoing grounds, the request of the plaintiffs to shift to Aurora Corporation the obligation to pay any of the fees awarded counsel for the sub-classes is denied.

As determined in Part IV, the plaintiff trustees are directed to pay:

| | |
|---|---:|
| To attorneys for non-union sub-class | $34,434.95 |
| Expenses to said attorneys | 986.45 |
| TOTAL | $35,421.40 |
| | |
| To attorneys for union sub-class | $26,787.86 |
| Expenses to said attorneys | 922.28 |
| TOTAL | $27,710.14 |

IT IS SO ORDERED.