### Bradley WHITE, Plaintiff,

v.

### Madeline L. MARTIN, individually as trustee and fiduciary of the Bob Martin Trucking, Inc. Profit Sharing Plan, Defendant.

No. 99–CV–1447.

United States District Court,
D. Minnesota.

March 31, 2003.

Steven E. Rau, Flynn, Gaskins & Bennett, L.L.P., Minneapolis, MN, and Matthew B. Newman, Newman Law Office, Savage, MN, for plaintiff.

Madeline L. Martin, Eden Prairie, MN, defendant pro se.[1]

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

TUNHEIM, District Judge.

Plaintiff Bradley White ("White") is suing defendant Madelaine L. Martin ("Lyn Martin") individually and in a derivative capacity on behalf of all the participants of the Bob Martin Trucking, Inc. Profit Sharing Plan ("Plan"). He is suing for breach of fiduciary duty under section 409 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1109 and for failure to provide information under ERISA § 502(c).

This matter came before the Court for trial from April 29, 2002 to May 3, 2002. The Court received final closing arguments from the parties in writing on June 21, 2002. Based on the entire record and proceedings, the testimony at trial, and the arguments of counsel, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

**1.** All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence.

**2.** To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

### *The Company and the Plan*

**3.** In 1979, Bob Martin Trucking ("BMT") established the Plan, which was 100% employer-funded and was a "pooled plan," in which employees cannot direct their investments. The Plan sponsor and administrator was BMT, and Bob Martin

---

**1.** Lyn Martin's trial counsel, Mark G. Ohnstad, withdrew as her attorney on October 24, 2002. As of the date of this Order, no new counsel has entered an appearance for defendant.

was the Plan's trustee and named fiduciary.

4. BMT hired a third-party firm, Tax Sheltered Compensation, Inc. ("TSC"), to provide administrative services to the Plan.

5. TSC services included: designing and implementing the Plan; performing the Plan and trust accounting; determining Plan eligibility; determining participant allocation; calculating trust earnings; maintaining the Plan's compliance with the law; and preparing annual reports to Department of Labor and the Internal Revenue Service.

6. Mark Foster of TSC supervised the firm's work on the Plan and was a contact person with BMT.

7. In performing services for BMT, TSC relied upon information provided by the Plan trustees.

8. Neither TSC nor its employees provided the Plan or its trustees and fiduciaries with legal advice, nor did TSC or its employees have any input or control over how the Plan's assets were managed.

9. The Plan is governed by, among other documents, a trust document ("Trust") that outlines the obligations, duties, and powers of the trustees.

10. When the Plan was first established, participants were annually provided certificates showing the value of each participant's interest in the Plan at the close of each Plan year, which was at the end of February.

11. Under the Plan, employees are entitled to take a loan against their Plan assets at the discretion of the trustees. Such loans may not exceed $50,000.00, no matter how large the employee's vested interest in the Plan.

12. Under the Plan, a participant/employee who left BMT before retirement could not receive distributions until the second anniversary of the close of the fiscal year in which the employee left the company.

13. On September 24, 1993, Lyn Martin was appointed as a co-trustee of the Plan and took the oath of trustee, which provided:

> I hereby accept my appointment, effective September 24, 1993, as co-trustee of the [Plan] as confirmed and approved by the Board of Directors of Bob Martin Trucking, Inc., and do swear that I will faithfully perform all of the duties of said office and Trust to the best of my ability and in accordance with the terms and provisions of said Trust.

(Ex. 140.)

14. Prior to becoming involved in BMT, and also while acting as BMT's bookkeeper, Lyn Martin managed a small real estate closing company. She was familiar with and understood the significance of signing legal documents.

15. Bob Martin was the Plan's only trustee until Lyn Martin's appointment.

### Plan Finances and Bob Martin's "Distributions"

16. Until 1995, Plan assets were held at Piper, Jaffray and Hopwood. Sometime in 1995, Bob Martin transferred the assets to Wellington West Capital ("Wellington"), a Canadian brokerage firm. Six Martin-related accounts were established at Wellington, with a Canadian and U.S. funds account for each of Bob Martin, BMT, and the Plan.

17. In the mid 1990s, Lyn Martin noted that Bob Martin's behavior became erratic. His spending habits changed, and the company started losing money. Lyn Martin began to distrust him.

18. Several BMT employees took out loans against their vested Plan benefits. Two such employees were former plaintiffs, David and Susan Burnham. These loans were to be repaid through deduc-

tions from the employees' paychecks. TSC statements from 1996 through 1998 show that money was deducted from employee paychecks—ostensibly to repay the loans—but these funds were never delivered to the Plan.

19. In approximately 1997, Lyn Martin discovered that Bob Martin had not delivered these loan repayments to the Plan. Lyn Martin calculated the amount she believed was owed to the Plan and sent those amounts to Wellington in 1997.

20. In November 1993, April 1996, and May 1996, Bob Martin executed guarantees of account with Wellington, which allowed Wellington to take funds from one Martin-related account to guarantee losses in other accounts. For example, funds from Bob Martin's personal account could be taken to cover losses in the Plan accounts, or funds from a Plan account could be used to cover losses in one of the Bob Martin Trucking accounts.

21. Lyn Martin's signature appears as a witness on two guarantees of account dated May 29, 1996. Although Bob Martin's signature also appears on these documents as the guarantor, Lyn Martin signed his name on these guarantees.

22. On July 11, 1997, Lyn and Bob Martin executed a document giving Lyn Martin power of attorney to trade in all the Martin-related Wellington accounts. Bob Martin signed his own name on this document.

23. Besides being owner of BMT, Bob Martin was a participant in the Plan. On September 11, 1997, Bob Martin borrowed $50,000.00 against his vested Plan assets. This loan was never repaid.

24. From 1996 until sometime in 1998, Lyn Martin controlled, directed, and approved all trading in the Plan's Wellington accounts, as well as those belonging to BMT and Bob Martin.

25. Lyn Martin spoke with brokers at Wellington daily, and as frequently as five times a day. Lyn Martin did not generally review Wellington's monthly statements for the Plan, because in 1996, 1997, and part of 1998 she followed all her investments on a daily basis and watched a financial cable television station to track their progress.

26. In January 1998, Lyn Martin instructed employees at TSC to deal only with her and not with Bob Martin.

27. In April 1998, Wellington twice exercised its rights of guarantee against Plan assets in the Plan's United States and Canadian accounts. Those exercises of guarantee were in the amounts of $160,525.59 and $181,446.40. These sums were transferred from the Plan's investment accounts to Bob Martin's personal investment accounts.

28. On June 19, 1998, Wellington, acting on Bob Martin's instructions, transferred $100,000.00 to him. This money was withdrawn to meet expenses of Bob Martin Trucking because the company had no other funds to pay its bills.

29. Bob Martin had asked Lyn Martin to withdraw the $100,000.00 from the Plan but she refused to do so, telling him to do it himself. Lyn Martin knew of Bob Martin's plan to withdraw $100,000.00 from the Plan before the wire transfer took place.

30. The exercises of guaranty and the $100,000.00 wire transfer were later characterized by TSC as "distributions" to Bob Martin from his Plan account. The unpaid $50,000.00 loan from September 1997 was also treated as a distribution and forgiven. These distributions totaled $492,071.99. This exceeded Bob Martin's vested balance of $462,427.21 as of February 28, 1998.

31. At the close of the Plan year ending February 28, 1997, the Plan had total assets of $1,305,546.63. One year later, at

the close of the Plan year ending February 28, 1998, the Plan showed a $513,527.73 loss in trading, which represented a 39% loss.

32. Because payroll deductions for employee loan repayments were not delivered to the plan, several employee loans from the Plan are still outstanding. TSC calculated the total amount of loan repayments owed to the plan as $15,371.43. The actual amount is likely higher, however, because TSC noted that this amount did not include payments collected after February 1999.[2]

33. Canadian law imposes a 10% non-resident tax ("NRT") on all interest and dividends held by non-Canadian residents. Between 1996 and 1998, the Plan paid a total of $3,470.75 in NRT.

## The Martin Divorce

34. In August 1998, Bob Martin attempted to remove Lyn Martin as a trustee of the Plan. Paperwork was prepared to make this change, but the record contains no signed and executed document removing Lyn Martin as a trustee, nor did TSC ever receive such a document. Lyn Martin never saw executed paperwork removing her as a trustee, but she was informed in September 1998 by Bob Martin's lawyer that she was removed. Despite her signature on the September 1993 oath of trustee, Lyn Martin testified that she did not know she was a Plan trustee or fiduciary until the start of this litigation.

35. On September 3, 1998, Lyn Martin filed a petition for dissolution of marriage in Hennepin County District Court. In April 1999, the Martins signed a marital termination agreement ("MTA") and one month later the Hennepin County court entered findings of fact, conclusions of law and order for judgment and decree. In the MTA, Bob Martin assumed responsibility for a marital debt to the Plan of approximately $450,000. The MTA also allowed Lyn Martin to retain all assets of the marriage and allowed Bob Martin to retain his ownership in BMT.

## White's Attempt to Get Information

36. White worked at BMT from August 1982 until August 5, 1997. As a BMT employee, White was a Plan participant. White was entitled to receive distributions under the Plan as of February 29, 2000.

37. Beginning in late 1997, White began asking Bob Martin for a statement of his Plan holdings for the year ending February 28, 1997. White continued to request this statement throughout 1998, but did not receive a statement.

38. After having no success obtaining a statement from Bob Martin, White retained attorney Matt Newman ("Newman"). On February 26, 1999, Newman wrote a letter on White's behalf to Bob Martin at the offices of BMT requesting all Plan documents to which White was entitled. White received no response from Bob Martin.

39. White then contacted Lyn Martin, speaking with her approximately seven or eight times between February and September of 1999.

40. Lyn Martin advised White that the Plan's assets were held at Wellington. White called Wellington to confirm that Plan assets actually existed.

## Demise of Bob Martin Trucking

41. In February 1999, Lyn Martin began working at BMT in an attempt to save

---

2. White claims that the total amount owed is at least $43,325.79. This amount is based upon Exhibit 345, but it actually represents other sums besides unpaid loans owed to the

Plan. Lyn Martin contends that the amount owed to the Plan is far lower, $9,573.84. Lyn Martin does not explain how she arrived at this sum.

the business. This involved office work, dealing with creditors, and preventing Bob Martin from taking money intended for the company. For example, Lyn Martin and others tried to prevent Bob Martin from taking checks from the mail. Lyn Martin worked at BMT until June 25, 1999, when BMT went out of business.

42. Until sometime in 1996, TSC received monthly copies of the Plan's investment account statements from Wellington and, before that, from Piper Jaffray. Starting in 1997 or 1998, Wellington statements were sent to the Martins' residence instead of to TSC.

43. In 1999, TSC wrote to the Martins saying it had not been paid for its services. TSC also repeatedly reminded Bob Martin and BMT that TSC needed the Wellington statements in order to complete Plan year-end statements for the years ending February 28, 1998 and 1999.

44. On August 17, 1999, Lyn and Bob Martin met with Mark Foster ("Foster") and Dave Wankel ("Wankel") of TSC. The Martins brought with them the Wellington statements that TSC had requested, except for the statement from March 1997, which was missing.

45. At the meeting, it was decided to terminate the Plan. This would involve performing a final accounting and distributing funds to each participant.

46. At or around the time of this meeting it was decided to characterize the Wellington exercises of guarantee, the $100,000 wire transfer to Bob Martin, and Bob Martin's $50,000 loan from the plan as "distributions" to Bob Martin, even though Bob was not yet eligible to receive distributions under the Plan. These "distributions" totaled $462,427.21, approximately $31,000 more than Bob Martin's total vested interest in the Plan. No one at TSC is certain who made the decision to characterize these payments as distributions.

47. Although TSC characterized these withdrawals as distributions, the MTA, which was filed several months earlier, characterized these amounts as debts to the Plan.

48. Wankel testified that these amounts were characterized as distributions because the plan would be soon making distributions, and the missing money needed to be accounted for somehow.

49. In late August 1999, all Plan participants were sent their Plan certificates for the Plan years ending in 1998 and 1999.

50. When White received his certificate, he compared his 1997 vested balance, which was $61,714.44, to his 1999 vested balance, which was $36,798.00. White had not taken a distribution and did not have an outstanding loan with the Plan.

### Litigation and Default Judgment Against Bob Martin

51. On September 22, 1999, White and the Burnhams filed this action against Lyn Martin, Bob Martin, and Bob Martin Trucking.

52. On September 28, 1999, this Court granted plaintiffs' request for injunctive relief, removing BMT and the Martins as trustees and administrators, and appointing Richfield Bank & Trust ("Richfield Bank") as the Plan's new fiduciary and trustee. The Plan's assets were transferred from Wellington to Richfield Bank.

53. On August 14, 2000, the Court entered a default judgment against Bob Martin and BMT in the amount of $753,728.80.

54. David and Susan Burnham withdrew as plaintiffs in this case on March 26, 2001.

55. The Court ordered that judgment would also be entered against Lyn Martin unless she paid the reasonable legal fees associated with the default pursuant to the

Court's August 14, 2000 Order. MLM paid $62,303.73 in those fees as ordered.

## CONCLUSIONS OF LAW

### I. Count One—Breach of Fiduciary Duty

White alleges that Lyn Martin breached her duty as a trustee and fiduciary of the Plan by imprudently managing the Plan's investments. *See* 29 U.S.C. § 1104(a)(1). Specifically, White alleges that Lyn Martin breached her duty by: (1) engaging in prohibited transactions under ERISA § 406; (2) failing to diversify the Plan's investments as required under ERISA § 404(a)(1)(C); (3) failing to follow a funding policy as required by ERISA § 402(b); and (4) violating ERISA § 404(b) by investing Plan assets through a Canadian firm.

■ A breach of fiduciary duty claim under ERISA involves a three-step analysis. *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir.1994). First, White bears the burden of proving a breach of fiduciary duty. *Id.* Second, White must demonstrate a prima facie case of loss to the Plan. *Id.* Once White has satisfied these elements, the burden of persuasion shifts to Lyn Martin, the fiduciary, to prove that the loss was not caused by the breach of duty. *Id.; Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992). Thus, the burden of disproving causation ultimately rests with Lyn Martin.

■ First, the Court must address Lyn Martin's fiduciary status. Although the parties spent considerable effort arguing over when Lyn Martin might have been removed as a trustee, it is clear to the Court that Lyn Martin was either a trustee or fiduciary when all the relevant transactions in this case occurred. Lyn Martin was appointed as a co-trustee of the Plan on September 24, 1993. In this capacity, she was clearly a fiduciary of the Plan and owed it the duties prescribed under ERISA. The parties do not dispute that all of the actions and omissions that form the basis of White's claims took place before August 1998. Moreover, even if Lyn Martin was not a Plan trustee, she would still be a fiduciary with respect to the Plan under ERISA § 3(21)(A), because she exercised discretionary control respecting the management and disposition of the Plan's assets. *See* 29 U.S.C. § 1002(21)(A)(i); *Johnston v. Paul Revere Life Ins. Co.,* 241 F.3d 623, 632 (8th Cir. 2001); *Maniace v. Commerce Bank of Kansas City, N.A.,* 40 F.3d 264, 267 (8th Cir.1994) ("[D]iscretion is the benchmark for fiduciary status under ERISA."); *Olson v. E.F. Hutton & Co., Inc.,* 957 F.2d 622, 625 (8th Cir.1992) (noting that ERISA § 3(21)(A)(i) "imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted"). Thus, the Court concludes that Lyn Martin is a Plan fiduciary for all claims in this case.

#### A. Prohibited Transactions

[3] ERISA § 406 prohibits a plan fiduciary from causing a plan to engage in certain transactions with parties in interest.[3] Although White's complaint does not

---

3. ERISA § 406 provides in relevant part that a plan fiduciary:

shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect -

. . . . .

(B) lending of money or other extension of credit between the plan and a party in interest;

. . . . .

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1)

The section also provides that a fiduciary "shall not deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b).

specifically allege a violation of §406, he contends that engaging in such transactions violated Lyn Martin's duty of prudence and of acting for the exclusive purpose of providing benefits to participants. *See* 29 U.S.C. §§ 404(a)(1)(A)-(B). Eighth Circuit case law suggests that this line of argument is permissible. *See Harley v. Minnesota Mining & Mfg.*, 284 F.3d 901, 908–09 (8th Cir.2002) (analyzing whether prohibited transaction under §406 constitute fiduciary breach, disregarding district court's suggestion that plaintiffs' failure to plead under §406 required dismissal); *FirsTier Bank, N.A. v. Zeller*, 16 F.3d 907, 911–12 (8th Cir.1994) (suggesting that §404 claim for fiduciary breach can encompass allegations of prohibited transactions under §406).

White specifically alleges that the May 1996 Wellington guarantees of account, which permitted Plan assets to serve as guarantees on losses in the BMT and Bob Martin accounts, constituted a prohibited transaction under §406. The Court agrees. The guarantees permit a transfer of Plan assets to Bob Martin, who is a "party in interest" under ERISA §3(21). (*See* Ex. 117.) Such a transfer is prohibited by ERISA §406(a)(1)(D), and is evidence of a breach of the duties under §404(a)(1)(A) and (B) to act with "care, skill, prudence and diligence" and to act for the exclusive purpose of providing benefits to the Plan participants. *See Harley*, 284 F.3d at 908–09. Furthermore, the exercise of these guarantees, which resulted in the transfer of $341,971.99 from the Plan's accounts to Bob Martin's personal accounts, resulted in a loss to the Plan. Defendant claims that these exercises of guarantee did not result in a loss to the Plan because the funds came out of Bob Martin's personal "account in the Plan." (Def. Proposed Findings at 8.) This argument is misplaced, and presumably rests on TSC's later characterization of this transaction as a "distribution" to Bob Mar-

tin. This later characterization was done for accounting purposes, and does not change the true nature of the transaction. At the time the guarantees were exercised, Bob Martin was not eligible to receive distributions from the Plan. Even if the amount of these guarantees coincided with Bob Martin's vested interest in the Plan, it does not mean the funds came from Bob Martin's "personal share." These funds were taken out of the Plan's assets and were moved to Bob Martin's private investment account with Wellington. (*See* Ex. 328.) This was not only improper under Plan rules, but was also a prohibited transaction under ERISA §406.

The Court finds that by signing Bob Martin's name on the May 1996 guarantees of account, Lyn Martin "cause[d] the plan to engage" in the guarantees, violating her fiduciary duty. (*See* Ex. 117; Tr. at 407.) Furthermore, Lyn Martin has not provided evidence to show that her breach did not cause the loss of $341,971.99. Therefore, the Court finds that Lyn Martin breached her fiduciary duty to the Plan by executing the Wellington guarantees of account.

**B. Duty to Diversify**

ERISA §404(a)(1)(C) imposes a duty of diversification under which "the trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on the success of one enterprise." *Bruner v. Boatmen's Trust Co.*, 918 F.Supp. 1347, 1353 (E.D.Mo.1996). Because Lyn Martin was a fiduciary with respect to the Plan's investments, she may be liable for breach of this duty. White rests his diversification argument on the fact that a significant portion of the Plan's losses came from investments in one company, Arcadia Financial, also known as

Olympic Financial ("Olympic"). The Plan's investments in Olympic resulted in a loss of $532,560.54 over two plan years, ending in February 1997 and 1998. White also notes that in the Plan year ending February 28, 1998, the Plan lost $513,527.73, approximately 39% of its value. Clearly, the plan had significant losses in Olympic, but White has produced no evidence to show that the Plan's investments in that company were "unduly large." The record shows that the Plan invested in approximately 58 different companies through Wellington, with many transactions involving hundreds of thousands of dollars, many of which were profitable. (*See* Ex. 328.) White has produced no evidence, expert or otherwise, to show that the investments in Olympic were improper, imprudent, or represented an unduly large portion of the Plan's assets. "[A]llegations that particular assets declined in value are, standing alone, insufficient to state a claim of fiduciary breach under ERISA." *Hunt v. Magnell*, 758 F.Supp. 1292, 1299 (D.Minn.1991). Although the losses in Olympic may demonstrate that Lyn Martin was unwise or simply unlucky,[4] it does not necessarily show that she was imprudent. Because White has produced no evidence other than a loss in investment value, the Court concludes that he has not proven a breach of the fiduciary duty to diversify.

### C. Funding Policy

■ White alleges that Lyn Martin failed to articulate a "funding policy," which he takes to mean a statement explaining the investment goals and strategies for the Plan. ERISA § 402(b)(1) requires that plans governed by ERISA "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan ...." 29 U.S.C. § 1102(b)(1). This is part of ERISA's broader requirement that all plans under its purview be governed by a written instrument, a rule "intended to ensure that participants are on notice of the benefits to which they are entitled and their own obligations under the plan." *Wilson v. Moog Automotive, Inc. Pension Plan*, 193 F.3d 1004, 1008 (8th Cir.1999). *See* 29 U.S.C. § 1102(a)(1). White contends that Lyn Martin's failure to craft a statement of investment goals and policies violates these ERISA provisions and is a breach of her fiduciary duty. Lyn Martin has conceded that the Plan did not have this type of "funding policy." (Tr. at 440–41.)

The case law does not support White's contention that ERISA § 402(b)(1) requires a policy statement outlining the Plan's investment goals and strategies. White has cited no cases supporting his contention, and the Court has found none. There is very little case law on the subject, and the one circuit case dealing with this provision treats it as a requirement to specify the mechanics of how the plan is funded, not how its assets might be invested. *See Voyk v. Brotherhood of Locomotive Engineers*, 198 F.3d 599 (6th Cir. 1999). In *Voyk*, the Sixth Circuit held that an ERISA plan "set out the procedure for establishing and carrying out a funding policy." *Id.* at 604. The court based its holding on the presence of the following language in the plan's instrument and description:

> [T]he plan is funded by the direct payments of the Organizations and by the

---

**4.** The record suggests that the Plan's losses in Olympic may have been at least partly due to fraud on the part of Olympic. The Plan and other investors in that company filed class action allegations for fraud, and reached a settlement with Olympic in October 2001. *See In re Olympic Financial, Ltd. Securities Lit*, Civ. No. 97–496, slip op. (D.Minn. Oct. 5, 2001).

payment of premium required by the Group Policies. The participants' or employees' contributions toward the cost of the Plan [are] at a rate determined by their respective Organization.

\* \* \* \* \* \*

Health Benefits are funded in general by the direct benefits payments of the Railway Labor Organizations. Each Organization may require Retired Employees and their Eligible Dependents to contribute toward the cost of the Health Benefits.

*Id.* This language clearly does not refer to investment strategies. The Court thus finds no support for White's contention that "funding policy" in the context of § 402(b)(1) refers to a statement of investment strategies.[5] Moreover, it is clear that the Plan does contain a funding policy of the type held sufficient in *Voyk.* (*See* Ex. 124 at 4–5; Ex. 136 at § 4.)

White's argument suggests that, rather than a "funding policy" under § 402(b)(1), he is actually referring to a "statement of investment policy," which is described in the federal regulations governing ERISA. *See* 29 C.F.R. § 2509.94–2. A statement of investment policy is "a written statement that provides the fiduciaries who are responsible for the plan investments with guidelines or general instructions concerning various types or categories of investment management decisions . . . ." *Id.* The regulations specify that such a statement "is consistent with the fiduciary obligations" embodied by the duty of prudence and the "exclusive purpose" rule. *Id.* White's arguments and evidence at trial suggest that he is alleging Lyn Martin should have created this type of statement for the Plan.

Although this explanation clarifies White's arguments, it does not promise them success. White's arguments fail because a statement of investment policy is not required under ERISA; it is merely one way of fulfilling fiduciary obligations. *See Liss v. Smith,* 991 F.Supp. 278, 296 (S.D.N.Y.1998) ("ERISA does not contain a specific requirement that a written investment policy be maintained by the trustees."). In *Liss,* the court held that even though ERISA does not require such a statement, the circumstances of the case dictated that absence of a policy constituted breach of fiduciary duty. The Court cannot reach a similar conclusion here. *Liss* involved large-scale "gross mismanagement, if not worse," in the Teamsters union, including embezzlement, kick-backs, skimmed profits, and conflicts of interest. *Id.* The circumstances in this case are not nearly as clear-cut as in *Liss,* so this Court cannot conclude that Lyn Martin's failure to create a non-mandatory statement of investment policy constitutes a breach of her fiduciary duty.

### D. Canada

White also alleges that Lyn Martin breached her fiduciary duty by violating ERISA § 404(b). This section bars any fiduciary from maintaining "the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States." 29 U.S.C. § 1104(b). Lyn Martin correctly argues that although Plan assets were invested through a Canadian brokerage firm, the assets were never "outside the jurisdiction" of the federal courts. As defendant notes, the Plan trust, which owns the assets, exists in the United States and is governed by Minnesota law. (*See* Ex. 137 at § 5.5.) Because the trust

---

**5.** The Court notes that several witnesses described a "funding policy" in this way. It is possible that this term is used in the field to describe an investment strategy, but that does not change the Court's conclusion that no case law supports White's interpretation of "funding strategy" under § 402(b)(1).

*res* never left the United States, the Court finds that the assets were never outside the jurisdiction of the United States Courts. Thus, White's allegations on this ground fail.

White also contends that Lyn Martin breached her duty of prudence by investing with a Canadian firm, thereby incurring a ten percent non-resident tax on certain dividends. The Court finds that in this instance, White has demonstrated a breach of fiduciary duty. ERISA requires fiduciaries to act "with the care, skill, prudence, and diligence ...." 29 U.S.C. § 404(a)(1)(B). Lyn Martin testified that she did not know until the trial in this case that the Plan assets—which she took charge of investing—were subject to a tax by the Canadian government. (*See* Tr. at 441.) In her defense, she notes that the amount of NRT that the Plan paid was small compared to the Plan's total assets. This is true, but it is only by chance, and does not negate the fact that throughout Lyn Martin's tenure as a fiduciary and manager of Plan investments, she remained ignorant of an important feature of investing through a Canadian firm. The Court finds that this negligence rises to the level of imprudence, and constitutes a breach of Lyn Martin's fiduciary duty. White has shown that there was a loss to the plan of $3,470.75 due to this breach,[6] and Lyn Martin has not shown that the breach did not cause the loss. Accordingly, the Court finds that Lyn Martin's ignorance of the Canadian non-resident tax constituted breach of her fiduciary duty pursuant to ERISA § 404(a)(1)(B).

## II. Count Two—Breach of Co–Fiduciary Duty under ERISA § 405

White contends that Lyn Martin is also liable as a co-fiduciary under ERISA §§ 405(a) and (b) for breaches committed by Bob Martin. ERISA § 405 provides in relevant part:

(a) Circumstances giving rise to liability

In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with [ERISA § 404(a)(1)] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

(b) Assets held by two or more trustees

(1) if the assets of a plan are held by two or more trustees -

(A) each shall use reasonable care to prevent a co-trustee from committing a breach ....

29 U.S.C. § 1105.

White contends that Lyn Martin is liable as a co-fiduciary for the following actions

---

**6.** Lyn Martin notes that the fee discounts she negotiated with Wellington should offset any NRT-related losses to the Plan. These discounts might be relevant if Lyn Martin knew about the NRT and sought the discounts specifically to offset tax losses. However, Lyn Martin herself testified that she never knew about the NRT while she managed the Plan's investments. (Tr. at 441.) Therefore, her efforts to obtain lower fees from Wellington are unrelated to the NRT and irrelevant to her fiduciary breach. This mere coincidence does not relieve Lyn Martin of her duty to be informed about the tax consequences of her investments.

of Bob Martin: (1) executing the Wellington guarantees of account; (2) embezzling Plan funds meant for repayment of employee loans; and (3) transferring $100,000 out of the Plan for the use of Bob Martin Trucking. White argues that Lyn Martin knew of these breaches but did not make reasonable efforts to remedy them, and that she did not use reasonable care to prevent Bob Martin from committing the breaches in the first place.

To succeed on his claims under § 405, White must first establish that Bob Martin breached his fiduciary duties to the Plan. He must then show that Lyn Martin either participated in those breaches or knew of the breaches but did nothing to remedy them. *Maniace,* 40 F.3d at 268. Because of the default judgment against Bob Martin, it is undisputed that he committed the fiduciary breaches in question. Thus, the only question for this Court is whether Lyn Martin took sufficient steps to avoid liability.

### A. Prohibited Transactions

■ The Court has already determined that Lyn Martin breached her fiduciary duty by causing the Plan to enter into the Wellington guarantees of account in violation of ERISA §§ 404(a)(1) and 406(a). The evidence also shows that Lyn Martin's actions in this regard constitute a breach of her co-fiduciary duty under § 405. Lyn Martin signed Bob Martin's name on the guarantees. When she did so, she knew or should have known that the guarantees would permit money to be taken from the

Plan and put into the accounts of Bob Martin or BMT. The Court finds no evidence that Lyn Martin did anything to prevent Plan assets from being transferred to these other accounts, and this demonstrates that she did not use reasonable care to prevent Bob Martin from committing this breach. Bob Martin has already been found, by default, to have breached his fiduciary duty in this regard. The Court finds that through her failure to fulfill the duties imposed upon her by § 404(a)(1), Lyn Martin enabled Bob Martin to breach his fiduciary duty. The Court thus finds that Lyn Martin breached her co-fiduciary duties under § 405 in regard to these prohibited transactions.

### B. Employee Loan Repayments

■ As discussed above, several BMT employees took out loans against their vested Plan assets as permitted by the Plan. These loans were to be repaid through deductions from the employees' paychecks. Although this money was deducted, some of it was never paid back to the Plan, and at least $15,371.43 remains owed to the Plan because of these loans. These funds became assets of the Plan— and thus the trustees' responsibility—as soon as they were deducted from employee salaries, even though they had not yet been delivered to the Plan.[7] *See* 29 C.F.R. § 2510.3–102(a); *Bannistor v. Ullman,* 287 F.3d 394, 402 (5th Cir.2002) (holding that "plan assets" includes "employee contributions to benefit plans which are withheld from employee's paychecks and for deposit

---

7. Lyn Martin argues that "the trustee does not become responsible for money until it is received by the Plan." (Def. Reply Br. at 6.) This misrepresents the testimony of Mark Foster, and directly contradicts well-established law. Foster testified that trustees do not have the responsibility to engage in "enforcement activities," such as ensuring that employees repay the loans. (Tr. at 151.) He also agreed with defense counsel's statement that "the

responsibility of the trustee for the money arises when the money gets [put] into the trust, not when it's still in the hands of the employer." (*Id.*) This statement is consistent with established case law holding that the money gets "put into the trust" as soon as it is deducted from employee salaries. *United States v. Grizzle,* 933 F.2d 943, 947 (11th Cir.1991).

into their benefit plans, even though the contributions have not actually been delivered to the benefit plan") (quoting *United States v. Grizzle*, 933 F.2d 943, 947 (11th Cir.1991)); *Voyk*, 198 F.3d at 606–07; *Golden v. wuvwrrr, Inc.*, Civ. No. 01–346, 2002 WL 264947 at *4–5 (D.Minn. Feb. 22, 2002) (citing the definition of "assets of the Plan" in 29 C.F.R. § 2510.3–102(a)).

Neither party presents much evidence of Lyn Martin's involvement in this apparent breach by Bob Martin. Defendant argues that when she became aware of Bob Martin's failure to forward the loan repayments to the Plan, she calculated the missing amount and sent it to Wellington. Indeed, the record contains evidence that Lyn Martin sent checks to Wellington for employee loans in February and July of 1997 in the amounts of $10,616.38 and $149.32, respectively. (*See* Ex. 322; 342.) White's argument appears to rest on the fact that even after Lyn Martin forwarded these sums to the Plan, some loan repayments were still owed to the Plan. White presumes that because some loan payments remained outstanding, Lyn Martin must have breached her fiduciary duty. White presents no evidence to support this argument. There is no evidence that Lyn Martin did not repay the entire amount owing in 1997, or that she knew if any amounts remained unpaid. The only evidence is of missing payments, repayments by Lyn Martin, and an outstanding balance today. The Court finds that this is insufficient to find Lyn Martin liable for co-fiduciary breach on this question. Indeed, the little evidence that does exist [8] shows that once Lyn Martin learned of Bob Martin's breach in this regard, she made "reasonable efforts under the circumstances to remedy the breach" as required by § 405(a)(3). Thus, the Court finds that White has not proven breach of co-fiduciary duty in regard to the loan repayments.

**C. $100,000 Wire Transfer**

■ White alleges that Lyn Martin breached her co-fiduciary duty by permitting Bob Martin to take $100,000.00 from the Plan assets to cover expenses of Bob Martin Trucking. The Court agrees. Lyn Martin testified that in June 1998, BMT was short on cash, and had two months of bills to pay. (Tr. at 398.) Bob Martin was in treatment and told Lyn Martin of his plan to take $100,000 from the Plan to cover expenses of BMT. (Tr. at 399.) Bob Martin asked Lyn to contact Wellington and get $100,000 from the Plan's assets, but she refused, telling Bob that if he wanted to take money from the Plan he would have to do so himself. (*Id.*) Bob Martin then faxed Wellington from his treatment center, requesting a wire transfer of $100,000 to a bank account at Norwest Bank. (Tr. at 400.)

Although TSC later characterized this wire transfer as a "distribution," [9] this was essentially an improper withdrawal of funds from the Plan by Bob Martin. This is a prohibited transaction under ERISA § 406(a)(1), and constitutes a breach of Bob Martin's fiduciary duty to the Plan. The evidence also shows that this breach was a loss to the plan. Lyn Martin claims that there is no loss to the Plan because the $100,000 came from Bob Martin's "account" in the Plan, but this is not so. The

---

**8.** Defendant's brief claims that Lyn Martin testified to this effect. After a thorough search of the trial transcript, however, the Court can find no testimony on this subject by Lyn Martin. The only evidence of Lyn Martin's repayments is the checks to Wellington.

**9.** As stated above, TSC called this a distribution because the Plan was being wound up. As an active employee and participant in the Plan, Bob Martin was ineligible for distributions. (Tr. at 24.)

money came from the Plan. Just because it was characterized two years later as a distribution for accounting purposes does not mean that the Plan did not lose $100,000 when the transfer was made. Finally, and most importantly, as discussed above, the evidence clearly shows that Lyn Martin knew of this breach but did nothing to prevent or remedy it, thus violating the co-fiduciary provisions of §§ 405(a) and (b).

## III. Claims Against Lyn Martin as Plan Administrator

■ White alleges that Lyn Martin violated ERISA § 502(c)(1)(B), which penalizes the plan administrator for failing to supply requested information within thirty days of a request by a Plan participant. *See* 29 U.S.C. § 1132(c)(1)(B); *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 946–47 (8th Cir.1999). Actions under this section may only be brought against the plan administrator. *Klosterman v. Western General Mgmt., Inc.*, 32 F.3d 1119, 1122 (7th Cir.1994). ERISA defines "plan administrator" as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated;

(ii) if an administrator is not so designated, the plan sponsor; or

(iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. § 1002(16)(A). The Plan in this case specifically designates Bob Martin Trucking as the Plan Administrator. (Ex. 124 at 2, 3.) The parties do not dispute that Lyn Martin does not fit any of ERISA's definitions of "plan administrator." [10] White claims, however, that by virtue of

her position and actions regarding the Plan, Lyn Martin was a "de facto administrator" and may be held liable under § 502(c)(1).

The Eighth Circuit has recognized a circuit split on whether a party other than one falling under the definitions of ERISA § 3(16) can be a de facto administrator of the plan. *See Hall v. Lhaco, Inc.*, 140 F.3d 1190, 1195 (8th Cir.1998) (citing cases). The Eighth Circuit declined to take sides on the issue in *Hall*, and has still not ruled on the question. The Eleventh, First, and Fifth circuits have held that claims may be brought against persons who are not technically plan administrators but who have been delegated responsibilities for administering an ERISA plan. *See Hamilton v. Allen–Bradley Co., Inc.*, 244 F.3d 819, 824 (11th Cir.2001); *Law v. Ernst & Young*, 956 F.2d 364, 372–74 (1st Cir.1992); *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1077 (5th Cir.1990). The Third Circuit has not ruled on this question, but all the other circuits have ruled that liability under § 502(c) is limited to the targets expressly identified in ERISA § 3(16). *See Jones v. UOP*, 16 F.3d 141, 145 (7th Cir.1994); *Lee v. Burkhart*, 991 F.2d 1004, 1010 n. 5 (2d Cir. 1993); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 403–05 (10th Cir.1993); *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 62 (4th Cir.1992); *VanderKlok v. Provident Life & Accident Ins. Co.*, 956 F.2d 610, 617–18 (6th Cir.1992); *Moran v. Aetna Life Ins. Co.*, 872 F.2d 296, 298–300 (9th Cir.1989); *Davis v. Liberty Mutual Ins. Co.*, 871 F.2d 1134, 1138 (D.C.Cir.1989).

The U.S. Supreme Court has observed that courts should be reluctant to tamper with an enforcement scheme that has been crafted as carefully as the one in ERISA.

---

**10.** The "plan sponsor" specified in ERISA § 3(16) means the employer, in this case Bob Martin Trucking. 29 U.S.C. § 1002(16)(B)(i).

*Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 209, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In light of this guidance, and in the absence of contrary direction from the Eighth Circuit, this Court finds it inadvisable to augment the highly specific definitions of "plan administrator" found in ERISA § 3(16). The Court will follow the majority of circuits in holding that because Lyn Martin is not a plan administrator as defined in the statute, she is not the proper subject of a claim under § 502(c)(1).[11] Therefore, the Court will dismiss Count Three of White's complaint.

## IV. Remedies

 The Court has found that Lyn Martin violated her fiduciary duty of prudence under ERISA § 404 by engaging in prohibited transactions that violate ERISA § 406(a), namely, the Wellington exercises of guarantee. She also breached her duty

by making investments that caused the Plan to lose money through Canada's non-resident tax. The Court has also found that Lyn Martin violated her co-fiduciary duty under ERISA § 405 by permitting and failing to prevent Bob Martin from engaging in prohibited transactions under § 406(a), namely, the exercises of guarantee and the June 1998 wire transfer.

Based on these determinations, the Court finds that Lyn Martin is personally liable under ERISA § 409(a) to make good to the Plan the losses that resulted from her breaches. As discussed above, the Wellington exercises of guarantee resulted in a loss to the Plan of $341.971.99. The June 1998 wire transfer resulted in a loss to the Plan of $100,000.00. Canada's non-resident tax caused a loss to the Plan of $3,470.75.[12] Interest upon each of these amounts, however, must be calculated and added to the total. The parties have each discussed the interest rate, but the Court

---

11. The Court observes that even if it recognized the concept of a de facto administrator, it is unlikely that Lyn Martin would qualify under the leading test articulated by the Eleventh Circuit. That test examines whether the purported plan administrator "had sufficient decisional control over the claim process." *Hamilton v. Allen–Bradley Co., Inc.,* 244 F.3d 819, 824 (11th Cir.2001); *Rosen v. TRW, Inc.,* 979 F.2d 191, 193–194 (11th Cir.1992). *See also Law v. Ernst & Young,* 956 F.2d 364, 374 (1st Cir.1992) (stating that to be a de facto administrator a person or entity must have exercised actual control over the administrator's functions). In *Hamilton,* for example, the court noted that many of the plan documents indicated that a company, though not the named administrator, controlled many of the administrative processes for the ERISA plan. *Hamilton,* 244 F.3d at 824. In this case, although the evidence shows that Lyn Martin exercised control over the Plan's investments, there is almost no evidence that she controlled the administrative mechanisms of the Plan.

12. White's claimed calculation of damages seeks reimbursement of two additional items

not extensively argued in the briefs. First, White seeks reimbursement to the Plan of the September 1997 $50,000 loan. Plaintiff has not expressly alleged or proven that Lyn Martin is responsible for this amount. Although Lyn Martin testified that she knew Bob Martin was taking out the loan, no evidence has been introduced that she had anything to do with his failure to repay the loan, or that Lyn Martin's involvement with the loan represents a breach of her fiduciary or co-fiduciary duties. Therefore, Lyn Martin is not liable for this amount.

Second, White seeks reimbursement to the Plan of $90,000 in legal fees incurred by Richfield Bank in the performance of its duties as Plan trustee. $30,000 was incurred through Richfield Bank's pursuit of an action in state court against the Martins and BMT, and $60,000 through the Bank's participation in settlement conferences in this case, even though it never became a party to the litigation. Although these sums undoubtedly represent losses to the Plan, the Court finds that the Bank's decision to spend these sums was not directly caused by any of Lyn Martin's breaches, and are too remote to merit reimbursement here.

finds their discussion insufficient to calculate an appropriate rate. Therefore, the Court instructs the parties to submit briefing on the appropriate interest rate in conjunction with their briefings on attorneys' fees.

Finally, because Bob Martin's vested interest in the Plan was 58% of the Plan's total value, the Court finds that it is equitable that Lyn Martin should not be held liable for her co-fiduciary's interest in the Plan. (*See* Pl. Proposed Findings ¶ 118.) The total damages owed by Lyn Martin will therefore be reduced by 58%. Accordingly, the final damage calculation will be as follows:

| | | |
|---|---|---|
| $ 341,971.99 + interest | (Wellington Guarantees of Account) | |
| + | | |
| $ 100,000.00 + interest | (June 1998 Wire Transfer) | |
| + | | |
| $ 3,470.75 + interest | (NRT Tax) | |

*Subtotal*
–(minus)
*58% of Subtotal*
= **Total Damages**

## ORDER

Based on the Court's Findings of Fact and Conclusions of Law, **IT IS HEREBY ORDERED** that:

1. Judgment is entered for plaintiff and against defendant as to Count One of plaintiff's complaint [Docket No. 1].

2. Judgment is entered for plaintiff and against defendant as to Count Two of plaintiff's complaint [Docket No. 1].

3. Count Three of plaintiff's complaint [Docket No. 1] is DISMISSED.

4. Defendant is ordered to pay to the Bob Martin Trucking, Inc. Profit Sharing Plan a sum to be calculated according to the formula prescribed in Part IV of the Memorandum Opinion accompanying this Order. Counsel for the parties must file within 30 days of the date from this Order a briefing addressing the proper interest rate to apply to the damages in this case, and the legal basis thereof.

5. The business of the Plan shall be wound up and the Plan shall pay all fees and costs incurred by Tax Sheltered Compensation, Richfield Bank, its corporate successor, the fiduciary and administrator, and their designated agents and attorneys, for performing their respective duties including winding up the Plan, collecting the judgment entered by this Court, disbursing to Plaintiff's counsel their awarded attorneys' fees and costs, and undertaking any other appropriate actions to protect the Plan's Trust *res*, including ensuring that the Plan document satisfies the Internal Revenue Code's requirements for tax-qualification and amending the Plan. When these matters are completed, all remaining amounts shall be distributed to the Plan Participants and beneficiaries under the direction of Tax Sheltered Compensation and the Plan's Trustees and Fiduciaries, and in compliance with the Plan documents. In no event shall Lyn Martin or Bob Martin receive distributions from the trust.

6. Plaintiff's counsel must file within 30 days from the date of this Order a petition setting forth the legal basis for this Court to order defendant to pay the reasonable attorneys' fees and costs incurred by counsel for the Plan, and the legal basis for the Court to order that plaintiff's counsel be paid from the Plan assets. This fee petition, and the defendant's response shall be governed by the Federal Rules of Civil

Procedure and the Local Rules of the District of Minnesota.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**