Jim **VOYK; Paul Kerrigan; James L. Bellessa, individually and on behalf of all others similarly situated, Plaintiffs–Appellants,**

v.

## BROTHERHOOD OF LOCOMOTIVE ENGINEERS, Defendant–Appellee.

No. 98–3937.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 16, 1999.

Decided Dec. 1, 1999.

Ellen M. Doyle (argued and briefed), Malakoff, Doyle & Finberg, Pittsburgh, PA, for Plaintiffs–Appellants.

Harold A. Ross (briefed), Ross & Kraushaar Co., L.P.A., Cleveland, OH, Jeffrey A. Bartos (argued and briefed), John A. Edmond (briefed), Guerrieri, Edmond & Clayman, Washington, DC, for Defendant–Appellee.

Before: WELLFORD, SUHRHEINRICH, and COLE, Circuit Judges.

## OPINION

WELLFORD, Circuit Judge.

Plaintiffs, retired officers and employees of defendant Brotherhood of Locomotive Engineers ("BLE"), sued the union claiming that it unlawfully failed to pay the plaintiffs promised retirement benefits and asserting four different bases for recovery: (1) promissory estoppel; (2) breach of agreement; (3) breach of fiduciary duty; and (4) the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. Both sides in this controversy moved for summary judgment in the district court, which ruled initially for defendant on claims (3) and (4) enunciated above. After this court's decision in *Sprague v. General Motors*, 133 F.3d 388 (6th Cir.1998) (en banc), the district court (a different judge) also granted the defendant's motion for summary judgment on the first two claims. Plaintiffs have timely appealed, and we now **AFFIRM.**

We note the undisputed facts taken from Judge O'Malley's decision filed September 8, 1997:

The BLE is a union representing locomotive engineers and trainmen. Along with other unions that represent railroad employees, the BLE is a member of an entity called Cooperating Railway Labor Organizations ("CRLO"). Among other things, CRLO engages in national negotiations on behalf of railroad workers regarding pay and benefits.

While various railroads employ CRLO union members, the CRLO unions themselves each employ their own officers and employees. When a union member leaves the employ of a railroad to become employed by the union itself, the member no longer receives benefits from the railroad. Thus, in order to provide medical benefits to their own elected officers and employees, some of the CRLO unions—including the BLE—participate in a multiple-employer health and welfare benefit plan ("Health Plan"). Specifically, the BLE and about a dozen other CRLO unions jointly entered into an agreement with The Travelers Insurance Company ("Travelers"), whereby Travelers would provide and administer a group health insurance policy for the benefit of each of the unions' officers and employees. Each union makes separate, direct payments to Travelers for its portion of the coverage provided by the insurance policy—each union is assessed a varying monthly charge based on its number of active employees. In 1993, each union was charged over $1,000 per month per active employee. Although each union's premium payments depend on the number of its *active* employees, the insurance coverage also applies to the unions' *retired* employees.

The Health Plan is governed by a written document ("Plan Document"). The Plan Document states that the Health Plan is administered by the CRLO Health and Welfare Committee ("Health Committee"). The Health Committee is comprised of representatives of the CRLO unions that subscribe to the Travelers group health insurance policy—specifically, one representative from each participating union. Through 1993, the Plan Document contained a "funding clause," which stated that "the [Traveler's group health insurance policy] provide[s] for receipt of premium payments from the [CRLO unions]; contributions are not to be made by the employees." The Plan Document also provided that the CRLO unions "participating in the [Travelers policy] shall have the right to terminate, suspend, withdraw, amend or modify the Plan in whole or in part at any time." In late 1993, the participating CRLO unions elected to modify the Plan, and deleted the "funding clause." The CRLO unions then replaced the "funding clause" with the following language:

> The Plan is funded by the direct payments of the [CRLO unions] and by the payment of premium[s] required by the [Travelers insurance policy]. The participants' or employees' contributions toward the cost of the Plan is at a rate determined by their respective [union].

Prior to this amendment, the Health Plan had provided free coverage for participating CRLO union retirees and their dependents. **Following this Plan amendment, however, the BLE elected to require each of its retirees and their dependents to contribute $100 per month per covered person to maintain their health insurance coverage.** (After the Plan amendment, some of the other CRLO unions also required their active and/or retired employees to contribute part of the costs of their health insurance coverage; other unions continued to pay the entire premium from union funds and forgo employee contributions.) The BLE's new contribution requirement motivated the instant lawsuit.

J/A 70–72 (emphasis added; footnotes omitted).

Thus, the Health Committee was the designated plan administrator which "ha[d] the authority to control and manage the operation and administration of the Plan." The Plan reserved, at all pertinent times, the right "to terminate, suspend, withdraw, amend or modify the Plan in whole or in part at any time." Accordingly, the Plan was amended to allow the individual unions to require contributions from its employees to help pay for the cost of the Plan. As stated above, the BLE in this case elected to require each retiree and their dependents to contribute $100 per month per covered person to maintain their health insurance coverage. The plaintiffs claim that it was unlawful to require them to make the contribution when the contribution amount was not provided for in the Plan documents.

In addition, the plaintiffs submitted evidence of letters and oral communications from the BLE indicating that the insurance policy contained lifetime health coverage free of charge. Some of the plaintiffs took early retirement based on those communications and assurances, forgoing an increased railroad pension. Each of the three plaintiffs retired by 1991 and received free coverage until 1994, when the $100 charge was instituted.[1]

In addition, the district court noted that the BLE deposits all employee contribution payments into a regular checking account called the Locomotive Engineers Health & Welfare Fund ("BLE Health Fund"), and pays the Plan administrator out of that fund:

> The BLE Health Fund is operated by the BLE as a regular business checking account; it is not operated in trust. The BLE deposits into the BLE Health Fund monies from several sources: (1) itself, to pay for health coverage for its own employees; (2) certain subordinate organizations, to pay for health coverage for these subordinate organizations' employees; and (3) retirees and their de-

pendents, whom the BLE requires to contribute toward the cost of their health coverage.

The plaintiffs claim that keeping their contributions in a regular checking account rather than a trust violates ERISA.

## A. Breach of Contract and Estoppel

As we have indicated, the plaintiffs claim that the BLE breached its contract by requiring them to make the monthly $100 contribution payments, and that the BLE should be estopped from requiring them to make such payments. Our analysis of this issue is controlled by our *en banc* decision in *Sprague, supra,* which served as a basis for the district court's grant of summary judgment.

In *Sprague,* retired salary employees of General Motors ("GM") brought a class action, similar to that in the instant case, alleging that GM was obligated to provide them fully paid-up lifetime health care benefits through retirement. The evidence showed that GM had represented in booklets and through oral communications that salary retirees would have paid-up health insurance during retirement. The pertinent plan documents advised, however, that GM had the right to "award, terminate, or change" the health care plan at any time. Because the plan materials reserved the right to change coverage terms, the court determined, the plaintiffs' rights to coverage had not vested. The court held that "[b]ecause vesting of welfare plan benefits is not required by law, an employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest 'must be found *in the plan documents* and must be stated in clear and express language.'" *Sprague,* 133 F.3d at 400 (quoting *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 937 (5th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993) (emphasis added)). The court also concluded that oral communications and assurances of lifetime cover-

---

1. The plaintiff class includes those, like plaintiffs, who are former BLE officers and directors (or their spouses) who retired prior to October, 1993.

age did not alter the terms of the written plan. *Id.* at 401; *see also Musto v. American General Corp.,* 861 F.2d 897, 907 (6th Cir.1988) (holding that unambiguous document allowing for plan modifications prevents benefits from vesting upon retirement). Furthermore, the court held that GM was not estopped from requiring employee contributions because "[p]rinciples of estoppel … cannot be applied to vary the terms of unambiguous plan documents." *Sprague,* 133 F.3d at 403.

The district court in the instant case followed that reasoning because it found that there were "no distinguishing facts of the present issues to those dealt with in *Sprague.*" Accordingly, the district court granted the BLE summary judgment on the breach of contract and estoppel claims.

We agree with the district court. As in *Sprague,* any oral assurances of free lifetime health benefits are not effective to change the written plan documents, which specifically reserve the right "to terminate, suspend, withdraw, amend, or modify the Plan in whole or in part at any time."[2] Thus, the plaintiffs' breach of contract/estoppel claims fail in this case.

## B. Amount of Contribution

■ The plaintiffs argue that the $100 contribution requirement is not enforceable because *the amount* of the contribution is not set forth in the plan documents. In its 1997 order, the district court held that the BLE did not violate any provisions of ERISA in requiring the contribution without having the amount in the "written plans."

ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). In addition, every employee benefit plan shall—

> (1) provide a procedure for establishing and carrying out a funding policy and

method consistent with the objectives of the plan and the requirements of this subchapter, . . . .

> . . .
>
> and
>
> (4) specify the basis on which payments are made to and from the plan.

29 U.S.C. § 1102(b). "The writing requirement ensures that 'every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.' … And the requirement lends predictability and certainty to employee benefit plans. . . . This serves the interests of both employers and employees. . . ." *Sprague,* 133 F.3d at 402 (citations omitted). In essence, the plaintiffs argue that, by omitting the $100 amount in the actual plan instrument and the summary plan description ("SPD"), the plan does not comply with the writing requirements of the statute.

The district court rejected the plaintiffs' "unwritten plan" argument. The court found that the plan documents were sufficiently complete, stating that "[a]n ERISA plan, '[a]t a minimum … implies the existence of intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits.' " (quoting *Donovan v. Dillingham,* 688 F.2d 1367, 1372 (11th Cir.1982)). The court concluded that determining contribution amounts is a function that employers regularly perform, and by doing so they do not become fiduciaries and they are *not* required to adopt a supplemental or additional plan. Because the written plan in this case described all of its pertinent aspects, the inclusion of the contribution amount was not required.

We find no error in this conclusion of the district court. The statute requires only that a plan "provide a procedure for establishing and carrying out a funding

---

**2.** The plaintiffs briefly discuss certain alleged misrepresentations made by the BLE regarding the $100 requirement. We are not persuaded that any allegation of misrepresenta-tion is well-founded, and it would not, in any event, serve as a basis for finding that the BLE was a fiduciary with respect to the health plan.

policy and method" and that it "specify the basis on which payments are made to and from the plan." 29 U.S.C. § 1102(b). As indicated, this plan instrument sets out that "[t]he plan is funded by the direct payments of the Organizations and by the payment of premium required by the Group Policies. The participants' or employees' contributions toward the cost of the Plan is [sic] at a rate determined by their respective Organization." The plan description states that "Health Benefits are funded in general by the direct benefits payments of the Railway Labor Organizations. Each Organization may require . . . Retired Employees and their Eligible Dependents . . . to contribute toward the cost of the Health Benefits." Thus, the documents set out the "procedure for establishing and carrying out a funding policy"—delegating to the employer the responsibility of deciding whether or how much employee contribution is appropriate for its particular organization.

Neither the statute nor the corresponding regulations require that the amount of the contribution be set out specifically in written plan documents. Furthermore, no legislation requires the BLE to promulgate its own individual plan documents. The plaintiffs have not cited to any cases to support their assertions. This court has indicated that Congress has "carefully prescribed a detailed list of matters that must be disclosed to plan participants. . . . [I]t ill-behooves federal judges to add to that list." *Sprague*, 133 F.3d at 405 n. 15; *see id.* at 402 ("We decline to apply . . . judge-made rule[s] . . . to augment the detailed disclosure provisions of the statute."). This is not a case where it is alleged that the plan documents are too informal to be enforceable as in *Elmore v. Cone Mills Corp.,* 23 F.3d 855, 860–61 (4th Cir.1994) (holding that the representations in letters which were not incorporated into formal plan documents were not sufficient to change terms of a plan). In the absence of any requirement—statutory or otherwise—that the amount of the employee contribution be included in the plan docu-

ments, we reject the plaintiffs' argument, and affirm the district court in this regard.

## C. Is the BLE a Fiduciary?

The district court found that the BLE was not a fiduciary with respect to the plan:

Under ERISA, an employer is a fiduciary with respect to a benefit plan only "to the extent [it] exercises any discretionary authority or discretionary responsibility in the administration of such a plan." 29 U.S.C. § 1002(21)(A). Fiduciary activity is therefore limited to "discretionary acts of plan 'management' and 'administration.'" *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 1072–73, 134 L.Ed.2d 130 (1996). For example, the administrative discretion to "grant or deny claims is the crucial factor that makes [an entity] a fiduciary within the terms of [ERISA]." *Tregoning v. American Community Mut. Ins. Co.,* 12 F.3d 79, 83 (6th Cir.1993), *cert. denied,* 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). "[U]nless an employer is found to be a fiduciary under 29 U.S.C. § 1002(21)(A) with respect to the function or conduct in issue," there is simply no fiduciary liability under ERISA. *Moffitt v. Whittle Communications, L.P.,* 895 F.Supp. 961, 970 (E.D.Tenn.1995); *Varity,* 116 S.Ct. at 1074.

"[B]ecause [the] defined functions [in the definition of fiduciary] do not include plan design, an employer may decide to amend an employee benefit plan without being subject to fiduciary review." *Lockheed Corp. v. Spink,* 517 U.S. 882, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996) (brackets in original, citation omitted). "Employers decide who receives . . . benefits and in what amounts, select levels of funding, adjust myriad other details of pension plans, and may decide to terminate the plan altogether. In doing these things, . . . they are no more the employees' 'fiduciaries' than

when they decide what wages to offer or whether to close the plant and lay the workers off." *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir. 1994); *see also Musto*, 861 F.2d at 912 ("when an employer decides to establish, amend or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards").

The district court concluded further that, because the plan documents vested authority in the Health Committee to administer the plan, and because the BLE had no separate, independent discretionary, administrative authority, "the BLE was simply not a plan fiduciary with respect to the Health Plan and cannot be liable for breach of fiduciary duty."

■ On appeal, the plaintiffs argue that the BLE engaged in a discretionary activity in imposing a contribution requirement on plan participants and, consequently, the BLE is indeed a "fiduciary" and its actions are subject to review for compliance with fiduciary duties. They rely upon *Abbott v. Pipefitters Local Union No. 522 Hospital, Medical and Life Benefit Plan*, 94 F.3d 236 (6th Cir.1996), wherein the trustees of a multi-employer union-sponsored medical benefit plan voted to impose different contribution rates without a plan amendment. The court in *Abbott* found that the setting of the contribution rate without a plan amendment constituted the exercise of discretionary authority in the management of the plan. *Id.* at 240. In that case, however, the employers and unions delegated to trustees the power to administer and interpret a benefit plan for employees covered by a collective bargaining agreement. Without amending the plan, the trustees adopted a higher contribution rate for one local's members than for members of the other local. This court held that the trustees' decision was an "administrative" task, governed by fiduciary standards, because

it involved the interpretation and application of plan documents and the exercise of power by plan administrators that was neither specifically granted nor prohibited by the plan.

■ *Abbott* is distinguishable from this case in important ways. First, the trustees in *Abbott* were named fiduciaries who were also responsible as administrators of the trust. Here, the BLE is neither a named fiduciary nor the plan administrator, and it had no authority to interpret or administer the plan. Also, the insurance plan in *Abbott* was never amended to provide for the setting of independent contribution rates for each local. In the instant case, however, the plan was specifically amended in 1993 to allow the participating organization to require retiree contributions. As we pointed out in *Abbott*, "it has long been the rule that an employer or plan sponsor does not act in a fiduciary capacity when adopting, modifying or terminating a welfare benefit plan.... When employers undertake those actions, they do not act as fiduciaries, but are analogous to the settlers of a trust." *Id.* at 239. The BLE in this case *modified* the plan by requiring retiree contributions pursuant to the authority granted in the plan documents. Such a decision was not a fiduciary action.

■ In sum, *Abbott* does not require the result urged by plaintiffs. Furthermore, the *en banc* court in *Sprague, supra*, held that "GM did not act as a fiduciary in deciding to change its health insurance policies," and to amend its plan to provide for payments by beneficiaries. *Sprague*, 133 F.3d at 404 (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996)). Again, the circumstances involved in *Sprague* are sufficiently like the circumstances in the instant case and it forecloses another of the plaintiffs' claims—that of breach of fiduciary duty.[3] Thus, we affirm the district court's

---

3. As stated in *Sprague*, "there can be no fiduciary responsibility to disclose the possibility

decision that the BLE did not act in a fiduciary capacity in imposing the $100 monthly contribution requirement.

### D. Prohibited Transaction Claim

■ Finally, the plaintiffs argue that the BLE breached its fiduciary duties in depositing the monthly retiree contributions into a general checking account rather than a separate trust account. They claim that the BLE was required to place the contributions into a trust account pursuant to 29 U.S.C. § 1103, and that comingling the plan contributions with their own funds constituted a "prohibited transaction" under 29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)(1).

Section 1103 requires that "all assets of an employee benefit plan" be held in trust by one or more trustees. Section 1106(a)(1)(D) provides, in pertinent part:

(a)(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he know or should know that such transaction constitutes a direct or indirect—

(D) transfer to, or use by or for the benefit of, a party in interest, of *any assets of the plan....*

29 U.S.C. § 1106(a)(1)(D) (emphasis added). Section 1106(b)(1) provides that "[A] fiduciary with respect to the plan shall not ... deal with the *assets of the plan* in his own interest or for his own account." 29 U.S.C. § 1106(b)(1) (emphasis added). By the clear language of the statute, the sections relied upon by the plaintiffs apply to the handling of "plan assets." Consequently, in order to succeed on this claim, the plaintiffs must show that the retiree contributions are "plan assets" when they are in the possession of the BLE.

The term "plan asset" is not defined in the statute, but it is described in the regulations:

[T]he assets of a plan include amounts ... that a participant or beneficiary pays to an employer, or amounts with-held from his wages by an employer, for contribution to the plan *as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets.*

29 C.F.R. § 2510.3–102(a) (emphasis added). The regulations also provide that "in no event shall the date determined pursuant to paragraph (a) of this section occur later than 90 days from the date on which the participant contribution amounts are received by the employer." 29 C.F.R. § 2510.3–102(c).

The plaintiffs argue that the retiree contributions in this case become "plan assets" the moment they are received by the BLE, because they did not originate from BLE's general assets, as in the case of contributions paid through payroll deductions. They rely mainly on two examples in the regulations. The examples explain that, in a small company with a small number of employees at a single payroll location, where the employees contribute to their 401(k) plan through payroll deductions, it is reasonable to expect the company to transmit the participant contributions to a trust within two days after the employees are paid. 29 C.F.R. § 2510.3–102(f)(1). The second example describes the same scenario, except that it involves a large national corporation with several payroll centers and uses an outside payroll processing service to pay employees and process payroll deductions for the 401(k) plan. 29 C.F.R. § 2510.3–102(f)(2). In the latter situation, the regulations suggest that the company could take up to ten business days to transmit the contributions out of the company's general bank account and into the plan's trust fund. The plaintiffs claim that these examples illustrate that money can be held in a company's general account for a certain period of time without becoming "plan assets" *only when the employee contributions are made through payroll deductions.* In this case, the plaintiffs argue, the funds are made

of a future change in benefits." *Id.* at 406.

directly from the retiree to the BLE and are capable of segregation from the moment the payment is made to the BLE.

We believe plaintiffs' argument ignores the totality of the examples in the statute and belies a common sense rationale. The two examples relied upon by the plaintiffs apply to pension plans, not welfare benefit plans. Also, they apply in situations where the employee contributions are made through payroll deductions. As previously stated, the instant case involves a welfare benefit plan in which the retirees contribute through direct payments to the BLE, not by way of payroll deductions. Thus, the more applicable example can be found in § 2510.3–102(f)(4), which deals with a medium-sized company that maintains a self-insured contributory group health plan, and several former employees have elected to continue coverage under ERISA. In that example, the employees directly pay the company for the continuation of benefits, and the checks arrive at the company at various times of the month and are deposited into the employer's general bank account. The example provides that those funds become "plan assets" "as soon as [the company] could reasonably be expected to segregate the payments from the general assets, but in no event later than the 90 days after a participant ... pays to an employer ... money for contribution to the plan." 29 C.F.R. § 2510.3–102(f)(4).

Following this example in § 2510.3–102(f)(4), we cannot accept the plaintiffs' contention that the contributions are "plan assets" at the time they are paid from the retirees to the BLE. Rather, the contributions only become "plan assets" at the time the BLE transmits the funds to the plan administrator, assuming that the transmission takes place within a reasonable time, but in no event later than ninety days after the funds are contributed.[4] Because the funds are not "plan assets" when they are in the possession of the BLE, ERISA

places no obligation upon the BLE to place the funds in a separate trust fund rather than in their general account. Accordingly, we find no basis for plaintiffs' claim in this respect.

## E. Conclusion

For the reasons stated, and for the reasons set out by the two district judges who decided the issues in this case, we **AFFIRM** the grant of judgment to the defendant union.

---

4. The plaintiffs do not argue that the time period between the contribution and the

transmission is an unreasonable amount of time.