**Charles LEMON, et al., Plaintiffs,**

v.

**BWX TECHNOLOGIES, INC., et al., Defendants.**

**No. 5:04CV2385.**

United States District Court, N.D. Ohio, Eastern Division.

July 11, 2006.

John A. Tucker, Law Office of John A. Tucker, Akron, OH, for Plaintiffs.

Allen S. Kinzer, Robert N. Webner, Vorys, Sater, Seymour & Pease, Columbus, OH, Richard D. Schuster, Vorys, Sater, Seymour & Pease, Cleveland, OH, Thomas R. Crookes, Vorys, Sater, Seymour & Pease, Akron, OH, for Defendants.

## MEMORANDUM OPINION & ORDER
[Resolving Doc. 38]

ADAMS, District Judge.

### I. Introduction

The plaintiffs, a group of retirees, brought this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA") and Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. §§ 185–187 ("LMRA"). They challenge the defendants' decision to increase their out-of-pocket healthcare costs, while not increasing the out-of-pocket healthcare costs of the active employees. The defendants have filed their Motion for Summary Judgment. In their motion, the defendants argue that the plaintiffs' claims under both ERISA and the LMRA fail as a matter of law. The Court has been advised, having reviewed the parties' pleadings; motions, oppositions, and replies thereto; attached exhibits; and applicable law. For the reasons set forth herein, the defendants' motion is granted in part and denied in part.

### II. Statement of Facts

#### A. The Parties

The plaintiffs are Charles Lemon, Donald Nichols, Mary Watts, Jess Marcum, Richard Ambrosic, and Gus Charnas ("the Retirees"). They are retired hourly employees of BWX Technologies, Inc., which is a nuclear equipment operations plant, who all retired during the period of time from January 1, 1989 through November 1, 2000. The Retirees are all aged sixty-five or under and are all receiving monthly payments from a vested pension plan. They are also participants in a welfare benefits plan that BWX maintains (the "Plan"), which provides the health insurance benefits that are central to this dispute.

The defendants are (1) BWX Technologies, Inc. ("BWX"), (2) BWX Medical & Life Insurance Plan for Hourly Paid Employees BWX Technologies, Inc., Nuclear Equipment Division, and (3) BWX Technologies, Inc. Plan Committee ("the Committee").

#### B. The Plan

The Plan is a self-insured health insurance benefits plan. The Plan, among other things, deals with funding and administration. It contemplates that "[c]ontributions necessary to fund benefits under the Plan shall come first from amounts contributed by Plan participants and then from the general assets of the Company." (Medical and Life Insurance Plan "Plan Doc." at Art. 2, § 2.2).

The Plan administrator is required to "administer the Plan in a uniform non-discriminatory manner with regard to all similarly situated Plan participants and their eligible family members." (*Id.* at Art. 3, § 3.2).

The Committee has the sole discretionary authority to interpret healthcare bene-

fits provisions and to decide all questions concerning the rights of Plan participants with regard to healthcare benefits. (*Id.*).

The Plan gives BWX—subject to the collective bargaining agreement—the right to modify or amend any of the Plan's provisions, as long as the modification or amendment does not "make it possible for any benefit to be used for, or diverted to, purposes other than for the exclusive benefit of participants under the Plan." (*Id.* at Art. 4, § 4.1). The Plan requires that any action BWX takes be made by resolution of its Board of Directors, or by a written instrument executed by persons the board has empowered to make such decisions. (*Id.* at Art. 5, § 5.1).

### C. The Collective Bargaining Agreements

BWX has always been a party to collective bargaining agreements with The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers, AFL–CIO and its Local 900 (the "Union"). The collective bargaining agreement has also always governed the healthcare benefits to which both the Retirees and the active employees ("the Actives") are entitled. The collective bargaining agreements have always set a maximum amount, or "cap," on the amounts that BWX was obligated to contribute on behalf of each person. The cap amounts, however, have always been different.[1]

Although there has always been a collective bargaining agreement in place, two collective bargaining agreements, in particular, are central to this dispute. The first of the relevant collective bargaining agreements ("the 1999 CBA") was in effect from May 1999 to April 2004. Section 22.01(b) set cap amounts for the Actives and Sec-

tion 22.01(c) of this agreement governed the rights to health insurance benefits for the Actives. This section, *inter alia*, provided that BWX would pay certain costs and that "[a]ny costs in excess . . . [would] be paid by the employee." (1999 CBA at § 22.01(b)-(c)). The 1999 CBA also contained a provision whereby the parties could change or amend the Plan by mutual agreement. (*Id.* at § 22.01).

Appendix F of the 1999 CBA governed health insurance benefits for the Retirees. Appendix F provided, *inter alia*, that the Retirees could receive healthcare coverage, but that they "[would] be responsible for paying the cost of [the] coverage and any future increases. . . ." (1999 CBA at Appendix F, ¶ 1). The Retirees were also required to pay "any future cost increases above the amounts specified. . . ." (*Id.* at ¶ 9). For purposes of cost calculations, both the Actives and the Retirees were "pooled." (*Id.* at ¶ 10).

In 1999, BWX became self-insured and Medical Mutual of Ohio ("Medical Mutual") served as a third-party administrator. Medical Mutual provided BWX with monthly statements as to the actual costs of healthcare benefits of both the Actives and the Retirees.

For the years ending 2000 and 2001, the actual costs did not exceed the cap amounts. Therefore, neither the Actives nor the Retirees were required to contribute additional money. For the year ending 2002, however, the actual costs exceeded the cap amounts. Rather than require contributions from the Actives and the Retirees, the Union and parties explored alternative ways to reduce the actual costs. At this time, BWX and the Union negotiated and agreed to amend the Plan to create a prescription drug program that imposed cost-sharing obligations on drug purchases

---

**1.** For a number of years, the actual costs did not exceed the cap amounts that were set.

by both the Actives and the Retirees. This eliminated the need for BWX to charge excess cost contributions.

For the 2002–2003 fiscal year, the costs greatly exceeded the cap amounts and the Union again intervened to avoid any contributions on the part of either the Actives or the Retirees. This time, the parties agreed to amend the Plan to increase the co-pay amount for doctor visits for both groups. The Union also agreed to amend the Plan to implement a drug-free workplace policy for the Actives. In exchange for these agreements, BWX again agreed not to collect excess cost contributions.

In early 2004, BWX and the Union began negotiations for a new collective bargaining agreement to cover the time period from May 2004 through April 2008 ("the 2004 CBA"). The provisions of the 2004 CBA remained, in essence, unchanged from the 1999 CBA. In other words, both collective bargaining agreements required the Actives and the Retirees to bear any costs that exceeded the cap amounts.

However, healthcare was again an issue because the actual costs for 2003–2004 fiscal year were double that of the prior fiscal year. The Union sought to avoid any cost contributions on behalf of the Actives and BWX sought to contain the Retirees' escalating healthcare costs by eliminating the pooling of both groups. According to BWX, eliminating the pooling would merely require the Retirees to bear the financial responsibility for the costs of their escalating healthcare.

After actively bargaining on the issue of healthcare, BWX and the Union decided to keep the excess cost obligations the same in the 2004 CBA, but they agreed in a Memorandum of Understanding ("MOU")

that the excess cost contribution provision would not be applied against the Actives during the term of the 2004 CBA.[2] They further agreed that the Actives and the Retirees would remain pooled and that the cap amounts for the Retirees would not be changed in any way. Although the 2004 CBA was essentially the same as the 1999 CBA, the effect of the MOU was to render Article 22.01(b)—which required the Actives to pay any excess costs—moot. In essence, the MOU required BWX to pay the excess cost contributions that the Actives were otherwise required to pay. The Retirees were notified that they, however, would be required to pay excess cost contributions.

The 2004 CBA was not formally amended to incorporate the MOU at the time it was entered into. Rather, BWX's Board of Directors adopted a resolution recognizing the MOU as an effective plan amendment retrospectively. It specified that the Plan was amended and stated that any actions previously taken were ratified and approved as duly authorized acts of the Board of Directors. This resolution was adopted almost one year after BWX and the Union agreed to the MOU and it was adopted *after* this litigation commenced.

During the time in which the 2004 CBA was negotiated, there was apparently some animus between the Actives and the Retirees. This animus was memorialized in an email sent by BWX's Manager of Labor Relations, James A. Wible, on the subject of "Retiree Healthcare." The email stated that the Actives believed that those Retirees who voted on the last collective bargaining agreement had "sold them down the river" and that the Actives did not want to do anything to help the Retirees. The email also stated that if there was any

2. The MOU states only the following: "For the four years of this Labor Agreement (May 1, 2004 through April 30, 2008) Article 22.01(c) will not apply to active employees."

money available, the Actives would want to "take it for themselves."

The animus is further memorialized in the transcript of the parties' labor negotiations. The labor negotiations also make it very apparent that BWX was concerned with the cost of the Retirees' healthcare and wanted to come up with a solution to manage that cost no matter what the effect on the Retirees. The following negotiations between BWX and a Union representative make this problem apparent.[3]

> BWX: There is only so much money to go around. . . . I will tell you flat out, the key thing for the Company here is to get retirees separated so that we gain some control over expenses.
>
> Union: Why is that?
>
> BWX: Because it's more retirees than actives. . . . It's an unmanageable situation.
>
> * * * * * *
>
> Union: It hurts the actives by pooling, but how does it hurt the Company?
>
> BWX: By making the actives unhappy. . . . There's a lot of shit going through out there that [the Actives] got screwed by [the Retirees] last time. We have had to listen to that for five years now. We don't need to continue with that feeling.
>
> * * * * * *
>
> Union: We are concerned with our members paying out of their pockets. . . . We want the cap the same with the same quality of benefit, we have needs. We would not like to cut the throats of our retirees. Even if we don't pay that increase, it will be going to retirees. So you are asking them to pay out of their fixed income?

> BWX: That is correct.
>
> Union: That isn't fair.
>
> BWX: That is what they voted for.
>
> * * * * * *
>
> BWX: We aren't going to shove up the cap for retirees to keep getting free healthcare. . . .
>
> Union: We want you to increase the cap.
>
> BWX: We aren't going to do that. [The Retirees] agreed to that. They have to accept responsibility for their actions. They went out with a plan.
>
> * * * * * *
>
> BWX: We are not interested in giving whatever money we have for [the Retirees]. They voted on a contract and a plan, they went out of here knowing what they signed up for. We have a lot of people who chose to go out early to get the benefits.
>
> * * * * * *
>
> BWX: The Company's position is that we aren't interested in putting money out there for the retirees.
>
> * * * * * *
>
> Union: That is a big hit for a fixed income. Not allowing them any increase in the cap that will just keep going up . . . you are forcing these guys to get out of their healthcare and save the money.
>
> BWX: There is certainly that part of healthcare.
>
> * * * * * *

At some point during the labor negotiations, BWX and the Union discussed "unpooling" the Actives and the Retirees.

---

**3.** The following labor negotiations are from exhibits attached to the deposition of James A. Wible that were attached to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (ECF Doc. 64). Only the salient portions of the transcript have been reproduced herein.

However, the Union's legal counsel advised against it and informed the Union that the Retirees' benefits under the terms of the 1999 CBA were vested. Furthermore, the Union's counsel advised that the Union could face a lawsuit if it unpooled the two groups. BWX, however, was not interested in putting any more money into the Retirees' healthcare and admitted that it needed to "rework the pension fund" to achieve its goal of not paying any more money for the Retirees' healthcare. BWX was concerned with making the arrangement "acceptable to [the] legal people." Nevertheless, it strongly suggested to the Union that the Actives get "unhooked" from the current pooling arrangement.

Accordingly, BWX proposed that it use the language in the collective bargaining agreement that required the Retirees to pay any future costs above the specified amount because the Union worried that changing the caps would cause legal problems. BWX stated that although that paragraph had never been used, it was in there and would play a "big role" in structuring an arrangement that would allow for the Retirees to absorb the increased costs. The Union expressed concern over the fact that if anything was taken away from the Retirees, either "legally or illegally," that it would cause problems. BWX's negotiating representative stated that his "off the cuff comment" was "so what, they don't vote."

The Union again expressed concerns that the Retirees, regardless of the fact that they did not have a vote, still could influence the Actives' vote and it commented that the it would have a hard time convincing its members to lower the cap because it would have to admit that the decision to lower the cap would "screw" the Retirees. BWX, however, told the Union to just tell the members that a decision was made to allocate charges to the people who were spending the money. The Union stated that it wanted to leave the Retirees alone. It stated that regardless of any changes, the Retirees would already be "paying, paying, paying" under the existing plan and it stated that BWX wanted the Retirees to pay *more* than the Union was proposing. BWX stated that it only wanted the Retirees to pay more because of the fact that BWX was trying to avoid increasing costs for the Actives. The Union stated its concern over the fact that BWX assumed that the Retirees were and would continue to be the group that was increasing costs. The Union stated that the Actives could actually become the liability because they also went over their cap. BWX conceded that it was not always the Retirees who exceeded the cap amounts.

The parties continued to negotiate the terms of the new contract. Although the Union was concerned with not changing the terms of the new contract as applied to the Retirees from what was negotiated in the 1999 CBA, it wanted to make sure that the Actives did not pay any additional costs. The Union stated that, regardless of the wording, the new contract was "penalizing" the Retirees. The Union pressed BWX to "come up with some money" to solve the problem. The Union stated that it wanted to leave Appendix F alone so that the Retirees' terms did not change, but it also wanted to change the wording requiring the Actives to pay. The parties ultimately agreed that Appendix F would stay the same and that the 2004 CBA would remain essentially unchanged from the 1999 CBA; however, the MOU would be added to acknowledge that the Actives would not pay for anything for the term of the contract. The effect of the MOU was that the negotiated contract terms set forth in the 2004 CBA would not be enforced against the Actives, but those same

terms would be enforced against the Retirees.

### III. Procedural History

In May 2004, BWX informed the Retirees that their healthcare costs would increase. Later that same year, the Retirees filed this action alleging that Defendants breached their fiduciary duty under ERISA and that BWX breached the collective bargaining agreement.

Shortly after the case was filed, Defendants filed their Motion to Dismiss on the grounds that they were not acting as fiduciaries under ERISA and that the collective bargaining agreement was not breached because it contemplated BWX's actions. Plaintiffs opposed the motion, which the Court denied.[4]

Even though the Court denied the motion, however, it chose to limit discovery in this action. The Court held a status conference to discuss discovery issues and issued a scheduling order whereby Defendants were to file their Motion for Summary Judgment. Upon filing the motion, Plaintiffs were permitted to file a Rule 56(f) motion outlining the discovery they needed to oppose the motion. Plaintiffs, upon objection, filed their Rule 56(f) motion and conducted limited discovery.

### IV. Legal Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The court is to determine "whether there is the need for a trial—whether, in other words, there are

any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Importantly, the court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmoving party. *LaPointe v. United Autoworkers Local 600,* 8 F.3d 376, 378 (6th Cir. 1993).

Summary judgment is appropriate if the party that bears the burden of proof at trial does not establish an essential element of its case. *Tolton v. Biodyne, Inc.,* 48 F.3d 937, 941 (6th Cir.1995) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. 2505. Having discussed the Rule 56 standard of review, the Court now turns to the merits of Defendants' motions.

### V. Law & Analysis

#### A. Plaintiffs' ERISA Claim

According to Defendants, Plaintiffs' ERISA claim fails as a matter of law because, in amending the Plan to provide that BWX would assume the excess cost obligations of the Actives during the term of the collective bargaining agreement, it

---

4. The Court initially denied the motion as to Plaintiffs' ERISA claim, but granted it as to their Section 301 claim. Plaintiffs, however, subsequently filed a Motion for Reconsideration of the Court's dismissal of their Section 301 claim. The Court reconsidered its decision and reinstated the Section 301 claim.

did not act as a fiduciary. Plaintiffs, on the other hand, argue that Defendants' actions amounted to plan administration and management because those actions dealt with funding.

An employer acts as a fiduciary under ERISA when it: (1) exercises any discretionary authority or control with respect to the management of a plan, or exercises any authority or control with respect to the management or disposition of plan assets; (2) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the plan, or has any authority or responsibility to do so; or (3) has any discretionary authority or discretionary responsibility in the administration of the plan. 29 U.S.C. § 1002(21)(A). An ERISA fiduciary is subject to the following standard of care:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries; and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

29 U.S.C. § 1104(a)(1).

▮▮▮ Because BWX wears "two hats" as both the employer and the plan administrator, *Akers v. Palmer*, 71 F.3d 226, 231 (6th Cir.1995), its actions relating the Plan can either be classified as fiduciary actions, which are governed by ERISA, or employer actions, which are not, *Sengpiel v. B.F.*

*Goodrich Co.*, 156 F.3d 660, 665 (6th Cir. 1998). Plan adoption, amendment, design or termination are not considered fiduciary actions. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). In other words, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). The threshold question, therefore, is whether BWX was acting as a fiduciary when taking the action subject to the Complaint.

Again, Plaintiffs argue that BWX's action in enforcing the MOU was an administrative action subject to ERISA's fiduciary standards and Defendants argue that it was merely a plan amendment permitted by ERISA. Although a close call, the Court agrees with Plaintiffs that the decision to apply the negotiated terms of the 2004 CBA to one group and not another did not affect plan design or alter any existing plan terms and that the decision is more properly characterized as a fiduciary action.

While it appears that the MOU was simply a "plan amendment," as Defendants argue, the record demonstrates that the MOU was created for the very purpose of allowing the Union and BWX to negotiate a deal that would allow BWX to both manage the assets of the Plan and administer it in accordance with its terms. *See generally Musto v. American General Corp.*, 861 F.2d 897, 911 (6th Cir.1988) (noting that managing and administering a plan in accordance with its terms is a fiduciary function). To explain, a large part of the labor negotiations that took place had to deal with the legal consequences that the parties could face had they agreed to change the terms of the Plan to either eliminate the pooling re-

quirement and/or change the cap amounts. So, while the MOU may appear to be a simple plan amendment, it was enacted as a means to an end. In other words, the MOU was created so that BWX could "technically" administer the plan in accordance with its terms, but at the same time not effectuate the terms of the plan against the Actives.

Admittedly, the act of creating the MOU falls easily into no category. However, in light of the negotiations that took place between the Union and BWX, the Court is of the view that Defendants were managing or administering the Plan when the MOU was created. It is apparent from the labor negotiations that funding the Plan was a central issue because the actual costs had exceeded the cap amounts. The evidence shows that in the past, BWX provided an evenhanded means by which the costs were allocated and that this practice was abandoned for purposes of negotiating the 2004 CBA. In fact, the labor negotiations make it clear that BWX was not interested in paying any additional monies toward the Retirees' healthcare.

 As an alternative basis for denying summary judgment, the Court finds that even if it chose to view the MOU as a plan amendment, it is beyond dispute that the MOU did not apply to the Retirees. Rather, the MOU applied only to the Actives. And, as Defendants argue repeatedly throughout their briefing, the 2004 CBA was unchanged and applied toward the Retirees as it was written. Operating on this assumption, it is still proper to deny summary judgment because, as previously stated, administering a plan according to

its terms is a fiduciary function.[5] The issue, therefore, becomes whether Defendants, in administering the Plan according to its terms by enforcing Appendix F, breached their fiduciary duties toward the Retirees. In other words, did Defendants discharge their duties with respect to the Plan solely in the interest of the Plan participants and beneficiaries, i.e. the Retirees? Clearly, there appears to be a genuine issue of material fact based on the context of the labor negotiations.

As such, Plaintiffs must be given the opportunity to pursue whether Defendants actually breached their fiduciary duties under ERISA because they have demonstrated a genuine issue of material fact whether Defendants discharged their duties in the interest of the Retirees as Plan participants. *See Winpisinger v. Aurora Corp.,* 469 F.Supp. 782, (N.D.Ohio 1979) (noting that ERISA requires a plan trustee to conform to a plan without a preference among participants). Accordingly, summary judgment on this claim is denied.

**B. Plaintiffs' Section 301 Claim**

██ Substantive federal law governs the enforcement and interpretation of collective bargaining agreements under Section 301. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). Traditional rules of contract interpretation, however, are applied as long as their application is consistent with federal labor policies. *See id.* at 457, 77 S.Ct. 912 (noting that state law may be applied "in order to find the rule that will best effectuate federal policy"). A retiree "has an undisputable and effective remedy against [an] employer for a

---

**5.** For this reason, the Court finds *Voyk v. Brotherhood of Locomotive Engineers,* 198 F.3d 599 (6th Cir.1999) distinguishable and does not find that it provides useful guidance on this issue. In *Voyk,* the plan was specifically amended to allow the company to re-

quire retiree contributions. *Id.* at 605. In this case, however, the Plan was arguably amended in a way that did not change the Plan as it applied to the Retirees. Thus, making *Voyk* distinguishable on the facts and inapplicable to this situation.

breach of contract under § 301(a)." *International Union v. Yard–Man, Inc.,* 716 F.2d 1476, 1485 (6th Cir.1983).

 In this case, applying the traditional rules of contract interpretation, there is no ambiguity in the language of the 2004 CBA. Appendix F clearly requires that the Retirees pay for any costs above the cap amounts. Plaintiffs, however, argue that a breach occurred because the terms of the 2004 CBA, which required that both the Actives and the Retirees make excess cost contributions, were contradicted by the MOU.

 Despite any apparent contradiction, however, the Court does not find that the MOU provides a basis for the Retirees to claim that Defendants breached the contract as it applied to them. Certainly, the MOU *may* have affected the Retirees indirectly, but it did not directly affect the terms of the collective bargaining agreement as those terms applied to the Retirees. The Court also agrees with Defendants that even if the implied covenant of good faith and fair dealing was read into the agreement, there is no basis for holding that it would trump the explicit terms of the agreement. *See generally Stephenson v. Allstate Ins. Co.,* 328 F.3d 822, 826 (6th Cir.2003) (noting that the Sixth Circuit "has declined to ascribe a covenant of good faith and fair dealing in the interpretation of a contract to 'override the express contract terms' "); *see also Big Yank Corp. v. Liberty Mut. Fire Ins. Co.,* 125 F.3d 308, 313 (6th Cir.1997) ("[A] party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing."). In short, the MOU does not affect the Retirees' obligations under the collective bargaining agreement. Summary judgment on this claim, therefore, is granted.

### VI. Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is DENIED as to Plaintiffs' ERISA claim and GRANTED as to Plaintiffs' Section 301 claim for breach of contract. The Court will schedule a status conference to determine the scope of any further discovery and to determine how this matter will proceed.

IT IS SO ORDERED.